# CHARLESTON.

### PROVIDENCE WASHINGTON INSURANCE COMPANY et al. v. BOARD OF EDUCATION OF MORGANTOWN SCHOOL DISTRICT.

Decided March 25, 1901.

1. WRITTEN CONTRACT—*Evidence.*

When parties have made a written agreement, the writing is regarded as the exclusive evidence of the contract, and all oral negotiations and stipulations preceding or accompanying the execution of the written agreement are merged in it, and are not admissible in evidence. See, also, *Long* v. *Perine*, (23 S. E. 611), 41 W. Va. 314, (syl. pt. 1). (p. 377).

2. INSURANCE POLICY—*Provisions—Waiver.*

In case of loss by fire under a policy containing a provision allowing the insurer to repair, rebuild, or replace the injured, building, and containing also a provision that the loss or damage should in no event exceed what it would then cost the insurer to repair or replace the same with material of like kind and quality, if the insurer should waive the right to repair or rebuild, and agree to pay the amount of loss and damages in cash, that fact would not change the basis of estimating the loss and damages, and the same should be ascertained precisely in the same manner as if it were the purpose to repair, rebuild, or replace the structure. (p. 378).

3. POLICY—*Total Loss—Restoration.*

There is no total loss of a building, requiring payment in full amount of the policy of insurance, if the remnant of the structure standing is reasonably adapted for use as a basis upon which to restore the building to the condition in which it was before the injury. (p. 385).

4. RESTORATION OF STRUCTURE—*Prudent Owner.*

Whether it is so adapted depends upon the question whether a reasonably prudent owner, uninsured, desiring such a structure as the one in question was before the injury, would, in proceeding to restore the building to its original condition, utilize such basis. (p. 386).

5. UMPIRE'S POWER—*Award—Mistake.*

When an umpire or arbitrator exceeds his authority, the effect of his act is the same, whether it was done consciously or by mistake, as in either case his award is void. (p. 386).

6. SYLLABUS APPROVED.

Syl. pts. 1, 5, 6, *Wheeling Gas Co.* v. *City of Wheeling*, 5 W. Va. 448, approved. (p. 386).

. Appeal from Circuit Court, Monongalia County.

Action by the Providence Washington Insurance Company and others against the Board of Education of the Morgantown School District.   Judgment for defendant.   Plaintiff appeals.

*Reversed.*

CALDWELL & CALDWELL and OKEY JOHNSON, for appellants.

GEORGE C. STURGISS, COX & BAKER, and LAZELLE & STEWART for appellees.

McWHORTER, JUDGE:

The Board of Education of the Morgantown School District procured from Providence Washington Insurance Company insurance in the amount of four thousand dollars on its two story tin roofed public school building on the east side of Spence Street in Morgantown, West Virginia, against loss or damage by fire, by policy dated December 24, 1894, to run three years from that date, and at the same time said Board of Education procured insurance on same building from Firemans Fund Insurance Company of San Francisco, California, by policy of same date in the sum of three thousand three hundred dollars, and seven hundred dollars on the school furniture and fiixtures in said building, which insurance was also for three years from said 24th day of December, 1895.   On the 11th day of January, 1897, a fire occurred in said building, burning the roof and attick.   On the 19th day of January, 1897, the said insurance companies by D. G. Morgan, their agent, entered into an agreement in writing, bearing date on that day, with said Board of Education, which agreement, omitting the signatures, and also showing the oaths of the appraisers, the selection and oath of the third appraiser, omitting the jurat in each case and the award of the appraisers as follows:

"Agreement for submission to appraisers.

This agreement made and entered into by and between the Board of Education of Morgantown Independent District, of the first part, and the Insurance Company or companies, whose name or names are signed hereto, of the second part,

Witnesseth; That C. W. Houston, of Morgantown, West Virginia, and Charles L. Hickman, of Clarksburg, West Virginia,

shall appraise and estimate the loss upon the property damaged and destroyed by the fire of January 11, 1897, as specified below. Provided, that in case of disagreement the said appraisers shall select a third, who shall act with them in matters of difference only. The award of said appraisers, or any two of them, made in writing in accordance with this agreement, shall be binding upon both parties to this agreement.

It is expressly understood that this agreement and appraisement is for the purpose of ascertaining and fixing the amount of said loss and damage only, to the property hereinafter described, and shall not determine, waive or invalidate any other right or rights of either party to this agreement.

The property on which the loss or damage is to be determined is as follows, to-wit: As per description hereto attached,

The Board of Education of Morgantown Independent District. On their two story brick metal roof public school building, situate at the head and on the north side of Walnut Street, in Morgantown, West Virginia.

On the school furniture and fixtures contained in the above described building.

(Damaged property must be arranged for appraisal.)

And it is furthermore expressly understood and agreed, that the assured must at once place the damaged property in as good condition as possible, assorting and arranging the same according to their kinds, separating the damaged from the undamaged, and fill out the schedule blank with a list of the articles upon which damage is claimed, showing the kind and quality of each, so that the appraisers may perform their duty with greater facility. The appraisers shall then determine the actual cash value of each article and place the damage on each at a definite sum per yard, pound, bushel or gallon, etc., as the case may require, in their proper counts. Articles without apparent or known damage are to be considered uninjured and not to be included in this schedule; and if any such are entered herein the appraisers will mark them not damaged." "Goods damaged by removal must be specified separately."

### "DECLARATION OF APPRAISERS.

*State of West Virginia, County of Monongalia, ss:*

We the undersigned do solemnly swear that we will act with

strict impartiality in making an appraisement and estimate of the loss and damage upon the property hereinbefore mentioned, in accordance with the foregoing appointment, and that we will make a true, just and conscientious award of the same, according to the best of our knowledge, skill and judgment. We are not related to the assured, either as creditors or otherwise, and not interested in said property or the insurance thereon. C. L. Hickman, C. W. Huston, Appraisers.

### SELECTION OF THIRD APPRAISER.

We the undersigned, hereby select and appoint E. W. Field, of Smithfield, Pennsylvania, to act as the third appraiser to settle matters of difference that exist between us by reason of and in compliance with the foregoing agreement and appointment.

Witness our hands this 6th day of February, 1897.

C. L. HICKMAN,

C. W. HUSTON.

### QUALIFICATION OF THIRD APPRAISER.

*State of West Virginia County of Monongalia, ss:*

I, the undersigned, hereby accept the appointment of third appraiser, as provided in the foregoing agreement, and solemnly swear that I will act with strict impartiality in all matters of difference that shall be submitted to me in connection with this appointment, and I will make a true, just and conscientious award according to the best of my knowledge, skill and judgment. I am not related to any of the parties of this agreement, nor interested as a creditor or otherwise in said property or insurance.

Signed, E. W. FIELD."

### "AWARD OF APPRAISERS.

*To the parties in interest.*

We have carefully examined the premises and remains of the property hereinbefore specified, in accordance with the foregoing appointment, and have determined the loss and damage on the building, to be six thousand, three hundred and thirty-

four 65-100 ($6,334.65) dollars. The loss and damage on furniture and fixtures to be one hundred and seventy-five dollars ($175.00).

Witness our hands this 4th day of March, 1897.

C. W. HUSTON,

E. W. FIELD,

*Appraisers.*

C. L. Hickman, one of the appraisers, does refuse to concur in the above report for the reason that it does not comply with the duties set forth above, nor to the terms of the policy.

C. L. HICKMAN."

The said insurance companies filed their bill in the circuit court of Monongalia County against the said Board of Education praying it be made a party defendant to the bill, and required to answer the same, and that said Board as a corporation, its agents, attorneys at law and all others be enjoined and restrained from bringing or prosecuting any suit in any court of this State for the recovery of the amount of said pretended award mentioned and described in the bill of exhibits; that proper process issue; that all proper orders be made and entered and accounts directed and taken; that said pretended award be set aside and declared to be null and void; that the cause be referred to a commissioner of the court with directions to ascertain and report the amount of loss sustained by the defendant in same upon the basis fixed by and according to the terms and conditions of the policies of insurance, and for general relief. The injunction was accordingly granted. The policies are filed as exhibits with the bill. The policy of the Providence Washington Insurance Company agrees to make good unto the said assured, "all such immediate loss or damage, not exceeding in amount the sum insured, nor the interest of the assured in the property, except as herein provided, as shall happen by fire to the property above specified, from the 24th day of December, one thousand eight hundred and ninety-five, at noon, to the twenty-fourth day of December, one thousand eight hundred and ninety-eight, at noon, the amount of loss or damage to be estimated according to the actual cash value of the property, hereby insured, at the time of the loss, which shall in no case exceed what it would then cost the assured to replace the same,

deducting therefrom a suitable amount for any depreciation of such property from use or otherwise, and to be paid sixty days after due notice and proofs of the same shall have been made by the assured and received at the office of the company in Providence, in accordance with the terms of this policy hereinafter mentioned; but provided that it shall be optional with the company to repair, rebuild, or replace the property lost or damaged, with other of like kind and quality within a reasonable time, giving notice of their intention to do so within thirty days after the receipt of proofs herein required; and in case the company elects to rebuild or not, the assured shall, if required, furnish plans and specifications of the building destroyed," and the said policy contains the following provisions: "It is agreed that no custom or usage of any kind, and no waiver of any kind, except in writing, endorsed on the policy, shall effect, control or avoid any of the provisions of this contract. If fire occur the insured shall give immediate notice of any loss thereby in writing to this company, protect the property from further damage, forthwith separate the damaged and undamaged personal property, putting it in the best possible order, make a complete inventory of the same, stating the quantity and cost of each article and the amount claimed thereon.

The amount of sound value and of damage shall be determined by mutual agreement between the company and the insured, or failing to thus agree, shall then be ascertained by appraisal of each article by competent persons. The company reserves the right to take the whole or any part of the articles at their appraised value. If difference shall arise between the parties hereto, touching any loss or damage, after proof thereof has been received in due form, the matter shall, at the written request of either party, be submitted to impartial arbitrators. The appraisers and arbitrators hereinbefore mentioned shall be impartial persons not interested in the loss as creditors or otherwise, nor related to the assured or to the sufferers, and shall be appointed as follows: One by the assured, one by the company, and in case those two are unable to agree upon an award, then they two to choose a third person, and their award, or that of the majority of them in writing made under oath before any magistrate or other properly commissioned person, shall be binding on the parties as to the amount of such loss or

damage, but shall not decide the liability of the company under this policy.

This company shall not be held to have waived any provision or condition of this policy or any forfeiture thereof by any requirement, act, or proceeding on its part relating to the appraisal or to any examination herein provided for; and the loss shall not become payable until sixty days after the notice, ascertainment, estimate, and satisfactory proof of the loss herein required had been received by this company, including an award by appraisers when appraisal has been required."

Very similar provisions are contained in the policy of the Fireman's Fund Insurance Company, as follows:

"This company shall not be liable beyond the actual cash value of the property at the time any loss or damage occurs, and the loss or damage shall be ascertained or estimated according to such actual cash value, with proper deduction for depreciation, however caused, and shall in no event exceed what it would then cost the insured to repair or replace the same with material of like kind and quality, said ascertainment or estimate shall be made by the insured and this company, or if they differ, then by appraisers, as hereinafter provided; and, the amount of loss or damage having been thus determined, the sum for which this company is liable pursuant to this policy shall be payable sixty days after due notice, ascertainment, estimate and satisfactory proof of the loss have been received by this company in accordance with the terms of this policy.

In the event of disagreement as to the amount of loss the same shall, as above provided, be ascertained by two competent and disinterested appraisers, the insured and this company each selecting one, and the two so chosen shall first select a competent and disinterested umpire; the appraisers together shall then estimate and appraise the loss, stating separately sound value and damage, and, failing to agree, shall submit their differences to the umpire; and the award in writing of any two shall determine the amount of such loss; the parties thereto shall pay the appraiser respectively selected by them, and shall bear equally the expenses of the appraisal and umpire.

This company shall not be held to have waived any provision or condition of this policy or any forfeiture thereof by any

requirement, act, or proceeding upon its part relating to the appraisal to any examination herein provided for, etc."

The bill alleges that the award was not made in accordance with the provisions of said policies or the agreement of submission, and charges misconduct on the part of appraiser Huston and of umpire Field; that Field acted not as umpire, to which end he was appointed, but as an original appraiser with Huston, and that said Huston and Field received instructions from the Board of Education as to how they should proceed to ascertain the loss and damages and that they complied with such instructions so improperly given in making up their award; that instead of ascertaining and fixing the loss and damage to the building and property according to the terms of the agreement of submission to the appraisers, the said Huston refusing to figure with his co-appraiser Hickman on such terms. He, said Huston, together with Field, the umpire, acting together as original appraisers, treated the building as a total wreck and worthless except as rubbish or debris, fixing the value of the building before and at the time of the fire as of the amounts of insurance thereon in the said two policies, deducting therefrom the value of the old material in said building as mere debris to be removed to give place to a new building, and alleging that the true measure of damages and the loss for which plaintiffs were only liable as to said building was "the amount which it would cost the insurer to repair, rebuild or replace the injured, damaged or destroyed property with other materials of the like kind and quality."

That said Huston at the time of, before and since the making of said pretended award made divers and sundry declarations and statements to divers and sundry persons as to the manner in which such value were to be and were considered. That he had frequently made the statement that if it were true that the appraisers were mistaken in the fact that said agent Morgan waived the right of the companies to repair or replace the damaged property; or if it should be true that said agent had no right or authority to make such waiver on behalf of the company; or if having made such waiver it should be true as a matter of law that such waiver did not or should not legally have changed the basis of calculation of loss from the basis fixed by the terms of the policy to that adopted by said Huston and

Field, his judgment in making up said award might have been different; and that if upon submission of matters to him with instructions from a court of competent jurisdiction, that as a matter of law, such waiver, if made, would not in the eyes of the law change the basis of calculation of loss from that fixed by the terms of the policy to any other basis—then under those instructions his finding and award might be different. Alleging that the said agreement for submission had for its object a single purpose, to-wit, "The purpose of ascertaining and fixing the amount of said loss and damage only to the property insured." That the fact of insurance, the fire, the fact of some loss and damage, the basis on which the loss should be calculated, were all admitted and not in controversy; that notwithstanding all this the said pretended award is based upon a makeshift and pretense false and fraudulent in this, that the said appraiser Huston and umpire Field abandoned the calculation fixed by the policies and upon the pretense that the agent Morgan had by his acts and declarations waived the rights of the companies to repair, replace or rebuild, that therefore the basis of calculation was waived, and they thereupon with bias and prejudice against the insurer and in favor of the insured and to the great injury of the insurers founded their pretended award upon the difference between the face of the policies as to the damaged building and their estimate of the worth of the old building considered merely as a heap of old rubbish to be torn down and removed or worked into an entirely new modern school building; that the amount of the loss sustained under the policies is the same, whether the right to rebuild was waived or not, and consisted in the amount which "it will cost the insured to repair or replace the damaged property with material of the like kind and quality;" that the said pretended award is not in fact and in law an award at all, first because the same is made and published contrary to and in violation of the agreement, conditions and stipulations of said agreement of submission, and the agreements and conditions embraced in said policies. And second, because the appraisers Hutson and Hickman did not act personally in the performance of their duties as appraisers, but that the cause was partly heard in the absence of Hickman by said Huston and umpire Field, and third because Field divested himself of his powers and character as an

umpire and assumed to act, and did act, in making up said pretended award as an original appraiser and not as an umpire; that when said appraiser and umpire decided and held that plaintiffs by their agent Morgan waived their right to repair or rebuild and by reason of such waiver the basis on which said loss should be calculated was shifted from the basis declared in the policies were guilty of a gross and palpable mistake in law, and that their pretended award is based and founded on such plain, gross and palpable mistakes of law, and that if such mistakes had not been committed their award would have been different, and that if such mistakes were corrected upon a re-submission to the same parties, or others, or to a commissioner in chancery, the result of the ascertainment of said loss would be different and less than two thousand five hundred dollars, instead of being over six thousand five hundred dollars, as found by said appraiser and umpire; that after careful investigation and upon estimates had from reliable and trustworthy architects and builders they could have repaired, rebuilt and replaced the damaged building and property with material of like kind and quality, and could have replaced the said building and property in better condition than that in which it was at the time of and before the fire for an expense of about two thousand one hundred dollars; and that plaintiffs had three separate and distinct bids from responsible builders and contractors for rebuilding and repairing the insured school house so as to make it better than it was before the fire and completely restore said building, one of said bids amounted to two thousand and twenty dollars and fifty cents, and one for two thousand one hundred and fifty dollars, and another for two thousand four hundred and fifty dollars, which included in it the loss of one hundred dollars for furniture and fixtures, blackboards, stoves, window blinds, wall paper, bells, all to be restored as before the fire; the last bid was by Wheeling parties, who stated that if they lived at or near Morgantown the bid would have been less. Plaintiffs say that being willing and anxious to pay the whole amount of loss and to show their good faith offered to and did pay into court two thousand five hundred dollars, which if not accepted by defendants before answering in the cause plaintiffs asked that the court decree to defendants only so much of the money so

paid into court as shall be fair, just and legally due it, and the residue of such money be ordered repaid to plaintiffs.

There is filed as an exhibit with the bill a notice by the defendants to the plaintiffs dated March 5, 1897, requiring them to pay to defendants the amount of said award at once, also exceptions by plaintiffs to the award and notice that they rejected the proof of loss and the pretended award, and that unless the parties could mutually or otherwise agree upon a different basis of settlement on or before April 5, 1897, the plaintiffs would proceed to repair, rebuild and replace the property lost and damaged with other of a like kind and quality within a reasonable time according to the terms and conditions of their several policies, except that the Firemans Fund Insurance Company was willing to pay the loss on personal property insured by its policies alone at the price of one hundred and seventy-five dollars, which was understood to be satisfactory to the board of education as to their property or the same would be replaced with other property of like kind, and notice and demand of the insured for plans and specifications of the building destroyed, which notice was served on the defendants on March 26, 1897. Plaintiffs also filed with their bill the denial of the board of education of the right of plaintiffs to repair, rebuild or replace the property in question, and its acceptance of the proposition of the Firemans Fund Insurance Company to pay the one hundred and seventy-five dollars for the loss on the personal property, also notice from the board to plaintiffs to the effect that having waived their right and option to repair, rebuild or replace the building, and having agreed to pay the amount of the award, they have no right now to assert their option to rebuild, repair, or replace the building, and that any attempt on plaintiffs part to do so would be treated as repudiation of their promises and agreement to pay the amount of loss or damages ascertained by said award, and would not be accepted by the board in lieu of the payment of the loss so ascertained, and that said board would as soon as the time had expired within which they might lawfully do so, bring suit for the recovery of said loss and damages so ascertained unless it should be paid before the expiration of said time, which notice was dated April 3, 1897. The bill alleges that plaintiffs had let the contract and had made every arrangement to rebuild and replace the damaged property in as speedy a manner as was reasonable and possible when they were

warned by said notices served on them by the board denying their right to repair, rebuild and replace said damaged porperty, in which plaintiffs were in good faith and only abandoned their intention of rebuilding and repairing when informed of the wreck of said building by dynamite and of the order of the municipal authorities of the town of Morgantown condemning said building.  The defendant filed its answer avering that the whole upper part of the building as the result of the fire was in ruins and all the rest and residue of the building was so damaged by fire and by water thrown on it in the effort to put out the fire, together with such incidental damage as would naturally result from the efforts of the firemen to extinguish the fire that it was practically worthless.  That D. G. Morgan, agent of plaintiffs, came to Morgantown and had a conference with defendant corporation, which tried to get a settlement with said Morgan while he was there, but he declined to make any offer or entertain any proposition from defendant, saying that in the end the matter would have to be arbitrated, as it was not likely that any agreement could be reached, and the best way was to submit the whole matter to arbitration at once and thus save time and trouble; that it was known at that time to said Morgan and to all parties concerned, that the erection of a new school building was being considered because the old one was not large enough if it had not been burned to accommodate the pupils of the school district, and Morgan was informed by defendant that if the matter was referred to arbitration without an agreement on the part of plaintiff corporations to stand by the award and pay the amount of same when made in cash and not repair or rebuild, that in case the plaintiff corporations were not satisfied with the award they would elect to repair, not because they could afford to do it, but because they would think that thereby they could intimidate defendant corporation and cause it to accept a smaller sum than that awarded to it, plaintiffs and said Morgan knowing that said defendant corporation wanted to build a new school house.  While if the award was unsatisfactory to this defendant corporation it had nothing it could do but accept the award; that Morgan as agent for both of plaintiff corporations assured the defendant that no such advantage would be taken or attempted to be taken by plaintiff companies; that they would not repair, but that as soon as the award was made

up, or within a reasonable time thereafter, would send their checks for the amount of the award and there would be no further trouble; that they did not want to rebuild or repair or replace the building; that they preferred to pay and that in this instance they would agree if defendant would consent to arbitration to pay the award in cash when made, and not rebuild, replace or repair, and to this he pledged his honor as a man, and avows that said Morgan, acting for both of said companies as an inducement for defendant to enter into an agreement to arbitrate agreed to pay the amount of award or appraisement when made in cash, upon which agreement defendant relied and accepted the same in good faith, and the promise to pay said award in cash when made and not to rebuild or repair, was a consideration and the chief consideration that induced defendant to enter into said agreement of appraisement and arbitration and without which defendant refused to enter into such agreement and would not have done so; that said further agreement to pay in cash was in all respects valid and binding, the subject matter thereof not being within the province of the agreement to arbitrate and appraise, but an agreement to pay in cash when the matters covered by the written agreement had been completed, and that after said agreement to pay in cash plaintiffs had no right to repair, replace or rebuild said building, or attempt to do so; that said agreement to pay cash was not void or voidable for want of consideration or as varying or contradicting or changing the written agreement to arbitrate because the consideration thereof was that defendant should enter into said agreement to arbitrate and abide by its result and did not vary or change or contradict the written contract because its subject matter was not covered by the written contract, but the same related to what should be done when the written contract should be completed.   The answer avers that said award as made up was fair and just and there was no misconduct on the part of C. W. Huston the appraiser selected by defendant, nor by E. W. Field the third appraiser, selected by the other two appraisers, but that it did appear from the very first visit to Morgantogn by C. L. Hickman, the appraiser selected by plaintiffs that said Hickman was an employe of said plaintiffs, and that he was not acting as an honest and disinterested and unprejudiced officer, but as the attorney and agent of the plaintiffs, and charging said appraiser Hickman with misconduct, and that finally at the dictation of

Morgan said Hickman refused to sign the award and wrote a dissenting opinion for the benefit of plaintiffs after said Huston and Field had made up their award according to the terms of the submission; and avering that with the exception of the conduct of said Hickman the appraisement and arbitration was conducted fairly, honestly and impartially and in exact accordance with both the letter and intention of the submission, and that the award is a just, fair and proper award arrived at after a careful, honest and conscientious investigation and calculation of the loss and damage to the furniture and building of defendant; denied all knowledge as to who placed the explosive in the building after the fire, the motive of such party; averred that the act was a complete surprise to defendant and was condemned and deplored by it. Denied that it had anything to do with the action of the town council in deciding the school building unsafe and condemning it as set forth in the bill, but there is no reason to doubt that the town council had good reasons for its action. Denies all allegations of mistakes or errors, misconduct, prejudice to plaintiffs' rights and improper basis of calculation on the part of the appraisers and arbitrators in making up the award complained of, and denies also the allegations that the award was grossly excessive or at all excessive, and that the plaintiffs have been injured or prejudiced by the conduct of the appraisers, and prays that plaintiffs' bill be dsimissed and the answer taken and considered in the nature of a cross bill; that defendant be decreed the amount of the award with interest thereon from the date of said award with its costs and for general relief.

Plaintiffs replied generally to said answer and filed a special replication to the answer of defendant, so far as it alleges new matter upon which defendant relies and prays for affirmative relief. Many depositions were taken and filed on behalf of both plaintiffs and defendant. Plaintiffs also filed exceptions to several portions of defendant's depositions on the ground that such portions are irrelevant and incompetent. The cause was heard and submitted on the 25th of October, 1899, on the bill and exhibits, the answer of the defendant, the general and special replication thereto, the depositions and evidence taken and filed in the cause, and the objections and exceptions of plaintiffs to parts of defendant's depositions, and the court overruled said objections and exceptions except as to three certain ones of them des-

ignated in the decree, as to which three the objections were sustained and the questions and answers and statements therein set out were rejected and not considered and proceeded to pass upon the merits of the cause.  The court dissolved the injunction and decreed that the defendant recover of and from the Providence Washington Insurance Company, one of the plaintiffs three thousand nine hundred and eighty-three dollars and one cent, with interest from date of decree, being its proportionate part of the loss and damage occasioned to the defendant by reason of the matters and facts appearing in the cause as ascertained by the appraisers with interest thereon from the 10th day of May, 1897, aggregated to date of the decree, and from the Firemans Fund Insurance Company the sum of three thousand four hundred and eighty-six dollars and eighty cents, with interest, etc., its proportionate share of the loss, etc., and decreed costs to defendant against plaintiffs, from which decree plaintiffs appealed to this Court, and assign as error that the circuit court rendered said decree for money against the plaintiffs when it should have set aside the award and referred the amount of the loss to a commissioner of the court to be determined because Huston, one of the appraisers, and Field, the umpire, were guilty of partiality and misbehavior in refusing as proposed by Hickman, the other appraiser, and as provided in the policies of insurance, to estimate the loss or damage on the building according to the actual cash value of the same at the time of the loss, not to exceed what it would then cost the assured to replace the same in as good condition as before the fire.  It is further insisted that "the circuit court, held, and it is assigned as error, that the insurance companies, by waiving the right to repair, and replace the building as it was before the fire, and by agreeing to pay the amount of the award money, also waived the right to have the amount of the loss estimated by the appraisers at such sum as would be necessary to make the building as good as it was before the fire.  In other words, the circuit court held, and it is here assigned as error, that the insurance companies by waiving the right to rebuild or replace, instead of paying cash, agreed to pay whatever amount the arbitrators should find the loss to be, although said arbitrators should be guilty of the partiality and improper conduct of refusing to estimate the loss by what was found to be the sum necessary to make the building as good as it was before the fire, and should and did estimate the loss at

the amount which the whole value of the building before the fire exceeded the value of the materials in the building after it should be torn down, and such materials be valued as so much old junk.

"The view adopted was that by waiving the right to replace and repair and agreeing to pay in cash, the insurance companies agreed to pay more than the loss. Such unjust holding of the circuit court and its action thereon in rendering said decree are also assigned as error."

Appellee insists that plaintiffs by their agent, D. G. Morgan, as an inducement to defendant to enter into an agreement to arbitrate the loss or appoint appraisers to ascertain the loss and damage waived the right of plaintiffs to repair, rebuild or replace the building damaged by the fire. The policies under which the insurance was taken provided that in case of disagreement as to the amount of loss the same shall be ascertained by two competent and disinterested appraisers, the insured and the insurer each selecting one, and the two so chosen to select a competent and disinterested umpire; the appraisers together shall then estimate and appraise the loss, stating separately sound value and damage, and failing to agree shall submit their differences to the umpire and the award in writing of any two shall determine the amount of such loss. Under this provision either party had the right to demand the selection of appraisers, and there was no necessity for offering inducements by either party to the other to enter into the agreement of submission. And it is further provided in the said policies that no waiver of any kind except in writing, endorsed on the policy, shall affect, curtail or avoid any of its provisions, and further the agreement of submission itself contains this provision, to-wit: "It is expressly understood that this agreement and appraisement is for the purpose of ascertaining and fixing the amount of said loss and damage only to the property hereinafter described, and shall not determine, waive or invalidate any other right or rights of either party to this agreement." And yet appellee insists on its right to prove a verbal waiver made by plaintiffs' agent, D. G. Morgan, at the time of said agreement to submit, and as an inducement thereto. The agent had no power or authority under the policies or either of them to make such waiver as is claimed, and no such waiver could be made by the parties unless the same should be endorsed in writing on the policy. In *Thompson* v.

*Insurance Company,* 104 U. S. 252, Justice Bradley in deliver-
ing the opinion of the court says: "The fourth replication sets up
a parol agreement of defendant made on receiving the promissory
note; that the policy should not become void on the non-pay-
ment of the note alone at maturity, but was to become void at the
instance and election of the defendant, which election had never
been made. As this supposed agreement is in direct contradic-
tion to the expressed terms of the policy and the note itself, it
cannot affect them, but is itself void." He further said: "An
insurance company may waive a forfeiture or may agree not to
enforce a forfeiture; but a parol agreement made at the time of
issuing a policy, contradicting the terms of the policy itself, like
any other parol agreement inconsistent with a written instru-
ment contemporary therewith, is void and cannot be set up to
contradict the writing. So in this case a parol agreement sup-
posed to be made at the time of giving and accepting the pre-
mium note cannot be set up to contradict the express terms of the
note itself, and of the policy under which it was taken."

The plaintiffs by their agent having demanded the appraisal,
a refusal to submit to same according to the provisions of the
policies, on the part of the defendant, would have estopped it
from maintaining an action for the loss, as held in *Hamilton* v.
*Insurance Company,* 136 U. S. 242. The provision in the agree-
ment of submission is express that the one purpose thereof was
to ascertain and fix the amount of loss and damage *only* and
should not waive or invalidate any other right or rights of either
party to the agreement. So there could have been no such verbal
agreement as an inducement to enter into the agreement of arbi-
tration, and if such was made it was simply void. Counsel for
appellee cite many authorities, including *Coles* v. *Insurance Co.,*
41 W. Va. 261; *Deitz* v. *Insurance Co.,* 21 W. Va. 851; *Wool-
pert* v. *Insurance Co.,* 42 W. Va. 647, to show the right of agents
to transact business for their principles, waive rights, etc., as the
companies themselves might do, but in no case cited is an agent
so authorized in violation of the principles involved as case at
bar. In this case the right to repair, rebuild or replace the
property damaged, among others was a right to the insurer
under the terms of the policy, which was by *express terms con-
tained in the agreement of submission not* waived, and it would
seem idle to insist that such right was waived by verbal agree-
ment made contemporaneously with such written agreement and

evidence to prove such verbal agreement so contradicting the written agreement of submission is inadmissible and the assignment of error of appellant for that reason is well taken and is sustained. *Irwin* v. *Irwin*, 169 Pa. St. 528, (29 L. R. A. 292); *Edwards* v. *Clark*, 10 L. R. A. 659; *Glass Co.* v. *Friedlander*, 84 Wis. 53, (21 L. R. A. 135); *Railroad Co.* v. *Wilson*, 4 L. R. A. 244, (Ind.); *Sanders* v. *Cooper*, 115 N. Y. 279, (5 L. R. A. 638); *Walton* v. *Insurance Co.*, (N. Y.) 5 L. R. A. 677; *Tuttle* v. *Burgett*, (O. U.) 30 L. R. A. 214.

In *Dean* v. *Mason*, 4 Conn. 428, it is held that "when an agreement is reduced to writing all previous negotiations resting in parol are resolved into and extinguished by the writing." The same doctrine is held in *Savercool* v. *Farwell*, 17 Mich. 308; *Diven* v. *Johnson*, 117 Ind. 512; *Monument Corporation* v. *Magoon*, 73 Wis. 627. And in *Gorsuch* v. *Rutlege*, 70 Md. 272, it is held, "When parties have made a written agreement the writing is regarded as the exclusive evidence of the contract, and all oral negotiations and stipulations preceding or accompanying the execution of the written agreement are merged in it, and are not admissible in evidence;" *Oelricks* v. *Ford*, 23 How. (U. S.) 49. In *Insurance Co.* v. *Moury*, 96 U. S. 544, it is held, "that a policy issued by the company and accepted by the assured must in a court of law be taken as expressing the final agreement of the parties and as merging all previous verbal stipulations." *Martin* v. *Cole*, 104 U. S. 30; *Long* v. *Perine*, 41 W. Va. 314, syl. pt. 1. "A writing being the repository of the true final agreement of the parties to it, and the highest and safest evidence of it, in the absence of fraud or mistake, oral evidence of prior or contemporaneous conversations or stipulations will not be admitted, to incorporate them in it so as to add to, alter, or contradict the agreement spoken by the writing." *Howell* v. *Behler*, 41 W. Va. 610. When an agreement names two arbitrators who, "shall appraise and estimate the loss upon the property damaged and destroyed by the fire * * * * Provided that in case of disagreement the said appraisers shall select a third who shall act *with them in matters of difference only.* The award of said appraisers, or any two of them, made in writing in accordance with this agreement shall be binding upon both parties to this agreement." And the person so chosen takes the following oath: "I, the undersigned, hereby accept the appointment of third appraiser, as provided in the foregoing agreement, and solemnly

swear that I will act with strict impartiality in all matters of difference that shall be submitted to me in connection with this appointment, and I will make a true, just and conscientious award, according to the best of my knowledge, skill and judgment."

Such third man is an umpire and can only act in such matters of difference in valuations between the other two as may be referred to him by them and award made up wholly by one of the original arbitrators and such umpire the other arbitrator taking no part in the estimate of the values or losses upon which such award is based could not be enforced.

It is claimed by appellee that appellants through their agent Morgan after the award and in flagrant violation of the agreement gave notice that they intended to rebuild, replace and repair the building, and afterwards the city council ordered it taken down or repaired as dangerous, and contends that appellants made no actual effort to rebuild, replace or repair it, and never did any act towards it. The record shows that after the award appellants gave notice of their intention to rebuild and repair and took bids from and let the contract to responsible contractors who were ready to go to work and repair and replace the building, when the board of education gave counter notice to appellants that they had no right to assert their option to rebuild, repair and replace said building, and any attempt on their part to do so would be treated by said board as a repudiation of their promises and agreement to pay the amount of damages or loss ascertained by said award and would not be accepted by said board in lieu of the payment of said loss and damages so ascertained, and that said board would bring suit on said award as soon as the time expired unless the same should be paid, and further the night before the work of repairing was to begin dynamite was exploded in the building wrecking and destroying it to a considerable extent. If it were true that the insurers had waived their right to repair or rebuild and had agreed to pay the award in cash, I cannot see how it would increase the loss or damage; the amount of their liability is the same in either case. They are liable for what it would cost the insured to have the property restored to the condition it was in before and at the time of the fire, and after the adjustment is made either by agreement as to amount or by arbitration, the insurers had the right to elect whether they would pay the amount ascertained in

cash or restore the building as it was before.  In *Morrell* v. *Insurance Co.,* 33 N. Y. 429,  (88 Am. Dec. 396), it is held : "If insurers after loss elect to rebuild premises under a provision in the policy allowing them to do so in lieu of paying money damages the contract of insurance is converted into a building contract and the amount insured ceases to be a rule of damages in cases of a breach ; if the insurer only partially performs his contract to rebuild, the measure of damages is the amount which it will take to complete the building so as to make it substantially like the one destroyed." And in *Henderson* v. *Insurance Company,* 48 La. Ann. 1176, (35 L. R. A. 385), it is held, "The election to repair is a contract which can only be discharged by its performance or execution.  Defects in the material in the original building will not excuse non-performance." And it is held that "if the insurer cannot reinstate without rebuilding a frame house with brick he must build with brick.  If owing to pre-existing defects in the building he cannot repair the fire damage without taking down and reconstructing the entire building he must take down and reconstruct even though the necessity was not due to the fire." 2 May. Ins. s. 433a.  *Fire Association* v. *Rosenthall,* 108 Pa. 474 ; *Brady* v. *Insurance Co.,* 11 Mich. 425 ; *Monteleone* v. *Ins. Co.* 47 La. Ann. 1568.  Counsel for appellee in their brief say, "The vital question and the only material question involved in this case is, should the award of the arbitrators or appraisers be set aside ?"  This seems to be the question in the case.  "There are many cases in which the courts have enquired into the correctness of the principle on which the arbitrator bases his decision." 2 Am. & E. E. L. (2d Ed.) 777m, note 1 ; *Hardy* v. *Innes,* 6 Moo. 574, 17 E. C. L. 59 ; *Johnson* v. *Durant,* 2 B. and Ald. 925, 22 E. C. L. 211.  "Where an action brought by the plaintiffs on a bill of cost not taxable was referred to the clerk of assize the court of exchequer held that it was within their power to enquire whether the arbitrator had adopted the right rule of taxation." *Broadhurst* v. *Darlington,* 2 Dowl. 38, and in *Comeforth* v. *Geer,* 2 Vern. 705, it was held, "That if the arbitrator acted upon a plain mistake, either as to the law or the facts, the award would be set aside in the same way as it would for an error appearing in the body of the award itself." 2 Atk. 644 ; *Richardson* v. *Nourse,* 3 B. & Ald. 237.  The policies both provided that in no case should the estimate of loss and damage exceed what it would then cost the assured to replace the

same, deducting therefrom a suitable amount for any depreciation of such property from use or otherwise, and that it should be optional with the insurer to repair, rebuild or replace the property lost or damaged with other of like kind and quality within a reasonable time, giving notice of their intentions so to do within thirty days after receipt of proof required by the policies. When the appraisers Huston and Hickman met and made their measurements together Hickman proposed to estimate the loss and damage to the building and ascertain what the cost of material and work would be to restore the building to its condition at time the fire occurred. This Huston refused to do. He refused to figure on any basis except that of a total loss and in his deposition he gives as his reason for not estimating the amount of loss and damage and the cost to replace the building that the insurers through their agent Morgan had waived their right to repair, hence he and his co-arbitrator Hickman disagreed on the basis of estimating the loss and damage and he (Huston) and Field the umpire as stated by Huston, "took the amount it was insured for, for the agreed value of the building. We then figured what the materials there were worth and deducted that from the amount of insurance." Huston was then asked the question, "If you were going to ascertain what the loss actually was to the building in case the insurer intended to repair or replace, what basis would you take to ascertain the loss?" Being told that this was a hypothetical question, after equivocating and asking several questions of the cross examining attorney, among which he asked, "What has any other case got to do with this case?" He finally answered, "We'd figured to replace everything that was burned or damaged by water and could be replaced and further stated that they would go over it item by item to ascertain what brick work would be necessary and the cost of it, and what wood work would be necessary and the cost of that, and the painting and everything of that kind, and when asked what he and Hickman disagreed on he stated, "We disagreed on what basis we should figure on." Witness further stated that "Mr. Hickman and I never figured together. We took measurements and data together, but we never figured together. We could not agree on the basis." Hickman corroborates Huston in that they had no disagreement as to values, as they estimated nothing together, and they only disagreed as to the basis of estimating the loss and damage, Huston insisting that because of the

waiver to rebuild on the part of the insurers the estimate should be based on total loss, while Hickman contended that the loss should be estimated on the basis provided in the policies at the cost it would be to the insured to restore the building to the condition it was in when the fire occurred. When Huston and Hickman had taken measurements and data for a basis of calculation as stated by Hickman "took measurements of the building in detail, went to the attic, examined all the damaged parts of it, come down through, took memorandums of the number of seats broken, amount of plastering that would have to be replaced, the center piece, broken glasses," etc., and that as they were leaving the grounds to go to the office to make estimates they met a boy who gave a note to Mr. Huston and they went to an office and had a long talk with the board (the defendant) and from what he could gather from the talk their object was to give the arbitrators how they should arrive at their award, as he understood them. "We were to take the value of the building as set forth in the policies and deduct the value of the old material or parts of the building remaining and the difference should be the loss." Hickman says: "After which we went to Mr. Huston's office and started in to make an estimate as I thought in the usual form. About the time I got started to make up the items Mr. Huston seemed to think that we could not do it that way and figure on the basis of open market values." Hickman further states, "I asked Mr. Huston why we could not get together on the same basis as we had figured other losses together before on the open market basis. He said well, ordinarily that it is the way I do, but he says the instructions and what I understand from what the board has said, we have no right to do it that way." When asked about this conversation Mr. Huston does not deny it unequivocally, and almost admits it, but certain it is from his own statements that he refused to estimate their loss with Hickman on the only fair and just mode of ascertaining the loss, and that provided for in the policies and in the agreement of submission. In any event whether the loss was to be paid in cash or whether building was to be rebuilt the only way to ascertain the true loss and damage was to find what it would cost the insured to repair, rebuild and replace the building restoring it to as good a condition as it was when the fire occurred, and the question as to whether the board wanted to erect another and better building in the place of the old one had nothing

to do with it.  Several witnesses testified that after the award was made Huston said the building could be put back as good as it was before the fire for from two thousand five hundred dollars to two thousand seven hundred dollars—Huston denies this in his testimony but admits that he might have told Morgan or someone else that the top could be replaced for that, but that would not make the building as good as it was before the fire. He further says, "I think Mr. Morgan asked me one time to send him a bid to put that top on.  Perhaps I told him I would."  On cross examination Mr. Huston admits that what he meant by putting the top on was replacing what was burned off; the roof and cupola and cornice and replacing all the woodwork that was burned, but said that would not make the building as good as it was before the fire.  It clearly appears from the record that the two arbitrators or appraisers, Huston and Hickman, did not act together in appraising and ascertaining the values and there could be no differences between them in matters upon which their minds were not brought to bear or act.  The umpire was provided for in the agreement of submission to act with the appraisers, "in matters of difference only" and the oath taken by the umpire was, "That I will act with strict impartiality in all matters of difference that shall be submitted to me in connection with this appointment, and I will make a true, just and conscientious award according to the best of my knowledge, skill and judgment."  The agreement of submission is clear and explicit that the umpire chosen by the arbitrators should, "act with them in matters of difference only," and the oath taken by Field, the umpire, is to the same effect that he would act with strict impartiality in all matters of difference that should be submitted to him.  The evidence of Field himself, as well as that of the arbitrators is to the effect that Field acted in connection with Huston alone in making up the award not as umpire to which position he was chosen, but as one of the original appraisers. Field in his testimony says, "Mr. Huston, Mr. Hickman and myself went there together and I took the view of the character that that building could not be made as substantial or as good as it was before the effects of the fire and freezing without tearing it down to a great extent so at least.  And I can't call to mind of Mr. Hickman ever being with us in one count or make up of the award afterwards except as he would drop into the office there occasionally."  The evidence of Field shows that he did not act

as umpire, but as an original arbitrator with arbitrator Huston, and with his deposition on cross examination Field filed a list of the old material which constituted the injured building and its value as old material by items as ascertained by Huston and himself, the aggregate of which values they deducted from the amount of insurance on the building in both policies, the residue making the amount of their award, instead of ascertaining the cost of restoring the building to its condition before the fire, as provided in the policies and in the agreement of submission. Appellee to show misconduct on the part of Morgan, the agent of appellants, introduced correspondence between them touching the matter of the arbitration. After selecting Hickman as arbitrator he wrote him from Grafton in which he says, "I signed for you as appraiser in the academy loss at Morgantown, the trustees, I am advised, do not want to repair the building, but get all the money they can and put up a new building. The building is very old and the depreciation should be large. The trustees claim a large damage, but in my judgment it will not reach more than one thousand dollars to one thousand two hundred dollars all told. * * * * The third appraiser for you I would suggest Mr. Aleck Zeck, of Grafton." "This letter was written at the postoffice address of Zeck no doubt after conference." Says appellee, then Hickman wrote Morgan March 1, 1897, "I enclose you copy of letter sent this day to Chauncey Huston. I hope this will meet with your approbation and that you will be sure to be on hand at the date set, as I will feel a little lonely without any counsel," etc., and counsel for appellee adds, "How does this conduct on the part of appraiser Hickman address itself to a court of equity? On the subject of such conduct see the case of *W. G. & Company* v. *C. of W.*, 5 W. Va. 448. No wonder Morgan insisted on arbitration if he was to select two of the three appraisers and then dictate the amount of the award. These transactions show clearly an intention to defraud the defendant in the matter of arbitration." From this it appears that both Morgan and Hickman were taking a lively interest in the matter, but after all how was the umpire chosen? By the two appraisers as provided in the agreement of submission? And did he come into the duties of his appointment unbiased and free from the influences of the parties interested? On the 10th of February, 1897, T. B. Williams, a member of the board of education, wrote Mr. Field as follows: "Sometime ago our school

house burned down, or partly so.  And the insurance companies have agreed to arbitrate the damages.  They selected Charles Hickman of Clarksburg, West Virginia, as their man and we took Chauncey Huston, of Morgantown, West Virginia, as our man.  Now it looks as though these two cannot agree on the amount of damage and I have recommended you as their third man and I think you are acceptable to both sides.  Please let me know by return mail this evening if you will accept.  And let me know if you can come at once if sent for, and oblige."  It would seem that the arbitrators would have but little trouble to find some one to act as umpire when both parties are so anxious to furnish the third man.  To whom did Williams recommend Mr. Field?  To Huston?  To Hickman? or to both?  However he was appointed or acted at any rate, although Hickman denies in his testimony of having anything to do with calling him to act. He acted not as umpire but as an original appraiser.  From the testimnoy of Field it appears that the building was estimated only as so much old material, even including the stone foundation.  The fire occurred in the roof, only burning the roof and attic, charring the floor of the attic and some of the trusses under the roof considerably burned, some of the joists burned off, the roof had sunk down and some of the rafters were burned off and the upper and lower floors were flooded with water; in the second story of the hallway one side of the stairway was about burned away and the floor and partitions on either side and probably some fire on the lower floor where some of the debris had dropped off the tower, as stated by T. B. Williams, one of the defendant's witnesses and a member of the board.  The window frames were not burned in the second story, nor was the paper burned off the walls.  It was all still there except some of it had loosened in places from the effects of the water.  Part of the plastering of the ceiling of the first floor was loose.  No fire below the square of the upper story to heat, expand and spring the walls, there could have been no special injury to them beyond what the water would do in loosening the paper and injuring the plastering.  It would be a remarkable case indeed that the burning of the roof of a two story brick building without any interior burning should destroy the walls to the bottom of the stone foundation to such extent as to render them useless as a basis for rebuilding thereon.  It would seem not only highly improbable but absolutely impossible.  It is pretty clear to my

mind that the difficulty in the settlement of the loss in this case grows out of the fact that the board had determined not to re-build the damaged house but to erect on the site of it a larger and altogether different building, one commensurate with their growing demands. It is hard to conceive how any reasonable mind can come to the conclusion from reading the record in this case that the loss was total. In *Royal Insurance Company* v. *McIntyre,* 35 L. R. A. 672 (Texas), it is held that, "No total loss of a building results under Texas Rev. Stat, 1895, s. 3089, requiring payment of the full amount of the policy, so long as the remnant of the structure standing is reasonably adapted for use as a basis upon which to restore the building to the condition in which it was before the injury." A very proper test as to what constitutes a total loss, "is the remnant of the building injured reasonably adapted for use as a basis on which to restore the building to the condition in which it was before the fire." And "Whether it is so adapted depends upon the question, whether a reasonably prudent owner, uninsured, desiring such a structure as the one in question was before the injury, would in proceed-ing to restore the building to its original condition, utilize such basis." *Royal Insurance Co.* v. *McIntyre,* cited. Then it fol-lows that the true test in the case at bar is, if the building be-fore it was damaged by the fire was just such a building as was suited to the needs of the board and they had been so unfortun-ate as to have no insurance upon the property when it was so damaged and desiring to restore it to its former condition would the board in so restoring it, utilize the remnant of the building as such basis. Certainly the stone foundation would have re-mained intact, and it is not probable that any considerable por-tion of the walls would have been taken down. At the time the bids were made by William A. Wilson and Son and others for replacing the building there seemed to be no question about the walls being a sufficient basis to support the building if repaired or replaced. The bids were made after an examination of the remains of the building and the bidders were responsible men. There was some evidence contradicting the fact of the walls being a sufficient basis for rebuilding or repairing, but it is prin-cipally the expression of opinion of men who had made no crit-ical examination of the walls. Parties examining for the pur-pose of contracting to repair the loss would make careful exam-ination because they had personal interest in the matter that

they might lose nothing on their contract for rebuilding. In *Wheeling Gas Company* v. *City of Wheeling*, 5 W. Va. 448, it is held, syl. pts. 1, 5 and 6 : 1. "Courts of equity have always had and exercised jurisdiction to interfere to set aside awards for fraud, accident, partiality, misconduct or mistake of the arbitrators. This power is even reserved to them in the statute provided for submissions on the record.

5. It is not alone the fact, but the aspect of perfect fairness which must be preserved, and an arbitrator cannot be too careful as to his conduct, holding this end in view. It is not a conscientious intent to be honest, on the part of the arbitrator, nor his conviction that he is so, that can suffice. It is external actions that will be subjected to scrutiny, and if these do not satisfactorily bear the test the award will fall.

6. There may be ample misconduct, in a legal sense, to make the court set aside an award, even where there is no ground for imparting the slightest improper motives to the arbitrators."

See *Sullivan* v. *Frink*, 3 Iowa 66, where it is held that an award can be set aside only for mistakes, misconduct, partiality or fraud in the arbitrators and it is further held that "In the legal idea of misconduct an evil intention is not a necessary ingredient." *Howard* v. *Edgell*, 17 Vt. 9 ; *Palmer* v. *Vanwick*, 92 Tenn. 397, (21 S. W. 761) ; *U. S.* v. *Farragut*, 89 U. S. 406, (22 Wall) and in *Borrowe* v. *Milbank*, 5 Abb. Pa. 28, 13 N. Y. Supre. Ct., 6 Duer 680, it is held, "When an umpire or arbitrator exceeds his authority the effect of his act is the same whether it is done consciously or by mistake, as in either case his award is void." In *Royse* v. *McKall*, 5 Bush (Ky.) 695, "On a submission to two arbitrators, who in case of disagreement, are authorized to choose an umpire, it is the duty of the arbitrators to make the award and the umpire is only authorized to act when they disagree. An award made under such submission in which the arbitrators and umpire all acted together, and made the award just as if they had been all arbitrators, will not be enforced." There can be no question that the arbitrator and the umpire who made the award made a palpable mistake in their basis of estimate when they proceeded to estimate the loss and damages' on the basis of a total loss, and if so the award may be set aside. *Head* v. *Murr*, 5 Rand. 122 ; *Crissman* v. *Crissman*, 5 Ind. L. (N. C.) 498 ; *Herrick* v. *Blair*, 1 John Chy. 101 ; *Roosevelt* v. *Thurmond*, *Id.* 220 ; *Davis* v. *Cilly*, 44 N. H. 448. For the reasons herein

stated the decree must be reversed and the cause remanded to the circuit court with directions to re-commit the cause to a commissioner in chancery to ascertain and report the true amount of loss and damages and for such further proceedings therein to be had as may be proper according to law and the rules of equity.

*Reversed.*