## CHARLESTON.

### VanWinkle v. Insurance Company.

Submitted February 23, 1904—Decided March 15, 1904.

1.   Arbitrators.—*Evidence—Notice.*
        In a suit to set aside an award because the arbitrators refused to receive or hear evidence, and it appears from the record that plaintiff had full notice of the meetings of the arbitrators, and

was called upon several times by one of the arbitrators during the work of the arbitrators, to whom the plaintiff furnished some bills to be used in evidence and said he had further evidence which he desired to present, but failed to appear before the arbitrators or offer any further evidence, the arbitrators cannot be held to have refused to hear or consider his evidence. (p. 292).

2. APPRAISERS.—*Evidence.*
While it is a general rule that if appraisers refuse to hear or consider material evidence it will be fatal to the award, it is also true that evidence must be offered before it can be rejected. (p. 296).

3. ARBITRATORS.—*Evidence.*
Where the plaintiff claimed to have papers material to his interests to present as evidence before the arbitrators, but failed to appear or present them, it cannot be said that the arbitrators rejected material evidence. (p. 298).

4. ARBITRATORS.—*Award—Evidence.*
Prior service of an arbitrator in a similar capacity does not render him incompetent, or invalidate an award in which he joined, in the absence of evidence showing that he was prejudiced. (p. 298).

5. ARBITRATORS—*Mistake of Judgment—Not Improper Conduct.*
Mistake of judgment in arbitrators is not sufficient evidence of improper conduct on their part to justify the setting aside of their award by a court of equity. (p. 302).

6. ARBITRATORS.—*Award.*
An arbitrator cannot contradict an award which he has signed. (p. 304).

Appeal from Circuit Court, Wood County.

Bill by W. W. Van Winkle against the Continental Fire Insurance Company. Decree for plaintiff, and defendant appeals.

*Reversed.*

HARRY P. CAMDEN, for appellant.

VAN WINKLE & AMBLER and MASON G. AMBLER, for appellee.

MCWHORTER, JUDGE:

W. W. VanWinkle was the owner of the one undivided half interest in a building in the city of Parkersburg, known as the "Academy of Music." upon which interest he had two policies of fire insurance of $2,000 each, one in The Continental Insur-

ance Company, the other The Westchester Fire Insurance Company. In December, 1895, while the said policies of insurance were in force the said building was partially destroyed by fire. Each of the policies contained a clause by which it was agreed that in the event of disagreement in the amount of loss the same should be ascertained by two competent and disinterested appraisers, the insured and the company each selecting one and the two so chosen to select a competent and disinterested umpire, the appraisers together then to estimate and appraise the loss, stating separately sound value, and damage, and failing to agree were to submit their differences to the umpire. The award in writing of any two to determine the amount of such loss. The insured and the said companies failing to agree upon the amount of loss entered into the following agreement in writing for submission of their differences to arbitration:

"This agreement, made and entered into by and between W. W. Van Winkle of the first part, and the Insurance Company or Companies whose name or names are signed hereto, of the second part, each for itself and not jointly.

"Witnesseth, That Stephen Davidson and George Hodgdon shall appraise and ascertain the sound value of and the loss upon the property damaged and destroyed by the fire of December 9, 1895, as specified below. Provided, That the said appraisers shall first select a competent and disinterested umpire who shall act with them in matters of difference only. The award of any two of them, made in writing, in accordance with this agreement, shall be binding upon both parties to this agreement as to the amount of such loss.

"It is expressly understood that this agreement and appraisement is for the purpose of ascertaining and fixing the amount of sound value and loss and damage only, to the property hereinafter described and shall not determine, waive or invalidate any other right or rights of either party to this agreement.

"The property on which the sound value and the loss or damage is to be determined is as follows, to-wit:

"W. W. Van Winkle, on his undivided one-half interest in the two and *and* three story brick, slate and metal roof building, known as Academy of Music occupied on first floor for mercantile purposes; one room on third floor occupied by tenants as private club or lodge room; one room on second floor as club room

by tenants, residue of building occupied by owners as public hall, dressing rooms, ticket office and manager's office for same situate on the northwest side of Juliana Street, between Fifth and Sixth Streets in Parkersburg, West Va.

"It is further expressly understood and agreed that in determining the sound value and the loss or damage upon the property, hereinbefore mentioned, the said appraisers are to make an estimate of the actual cash cost of replacing or repairing the same, or the actual cash value thereof, at and immediately preceding the time of the fire; and in case of depreciation of the property from use, age, condition, location or otherwise, a proper deduction shall be made therefor.

"In Witness Whereof, we have hereunto set our hands, at Parkersburg, W. Va., this 3rd day of January, 1896. W. W. Van Winkle. S. T. Carter for Westchester Fire Insurance Co. of New York. E. E. Cole for Continental Insurance Co., of New York."

The said appraisers mentioned in the agreement were duly sworn on the 6th day of January, 1896, to "act with strict impartiality in making an appraisement and estimate of the sound value and the loss and damages upon the property hereinbefore mentioned in accordance with the foregoing appointment, and that we will make a true, just and conscientious award of the same according to the best of our knowledge, skill and judgment. We are not related to the assured, either as creditor or otherwise and are not interested in said property or the insurance thereon. [Signed] Stephen Davidson, George Hodgden, Appraisers." The said appraisers then selected as umpire M. F. Geisey of Wheeling, to settle matters of difference between them in said appraisement. On the 14th of January, 1896, at the request of appraiser Davidson, and with the consent of George Hodgden, C. T. Hickman of Clarksburg, W. Va., was substituted for said Geisey as umpire and on the 15th day of January said Hickman accepted the appointment of umpire and took the oath, to act with strict impartiality in all matters of difference only that should be submitted to him in connection with his appointment, and that he would give a true, just and consciencious award according to the best of his knowledge, skill and judgment, and that he was not related to any of the parties to the agreement, nor interested as a creditor or other-

wise in the property or insurance. After having discharged their duties under said agreement and appointment the said appraisers and umpire made the following award:

"To the parties interested: We have carefully examined the premises and remains of the property hereinbefore specified, in accordance with the foregoing appointment, and have determined the sound value to be Twelve Thousand Dollars, and the loss and damage as a whole to be Six Thousand twenty-nine and 84-100 Dollars. Witness our hands this 15th day of January, 1896. Stephen Davidson, Geo. Hodgden, Appraisers. C. L. Hickman, Umpire."

At the June rules, 1896, W. W. VanWinkle filed in the clerk's office of the circuit court of Wood County, his bill in chancery against the said insurance companies, George Hodgden, Stephen Davidson and C. L. Hickman, charging that the said award was void and should be set aside by reason of misconduct of the appraisers and by reason of mistakes set forth in the bill, because of miscalculations therein and omissions of property that should have been included, by calculations of short quantities when true quantities should have been inserted, for unfairness and injustice, and praying that if the court could not revise the award that it should be set aside and rendered null and void, and that the court would decree plaintiff entitled to the full amount of the policies and that the court decree the $2,000 against each of said companies with interest from the second day of March, 1896, and that the said several parties mentioned be made parties to the bill and be required to answer the same under oath, and for general relief.

The said defendant companies, on the 20th of July, filed their joint demurrer to the plaintiff's bill, in which the plaintiff joined and afterwards on the 8th of August, 1896, the demurrer was overruled by the court and leave granted defendants to file their answer, and on the 7th day of September, the said defendant companies filed their joint and separate answer in which they denied the material allegations of the bill. Depositions were taken and filed in the cause and on the 5th day of February, 1903, the cause was heard on the process duly executed and the orders and proceedings had in the cause, the said answer and general replication and the bill taken for confessed, and set for hearing at the rules as to the other defendants except

Hodgden and upon the depositions taken on behalf of the parties respectively, on the orders and decrees theretofore made and the papers formerly read, and the court being of opinion that the award complained of in plaintiff's bill was unfair, unjust and improper, and that the same should be set aside as a fraud on the rights of plaintiff and decreed that the award dated the 15th of January and purporting to award to plaintiff the sum of $3,010.42 be vacated, annulled and set aside and held as null and void, and decreed that each of said insurance companies pay to the plaintiff $2,825, being the amount of $2,000 with interest thereon from the 2nd day of March, 1896, until the date of the decree, with interest on each of said sums from the date of the decree until paid, and awarded execution against each of said defendant companies for the amounts respectively, each execution to include one-half the costs of the decree. From which decree the defendant companies appealed.

The first assignment of error is the overruling of the demurrer to plaintiff's bill. The court is of opinion that the allegations of the bill are sufficient and that the demurrer was properly overruled, and in view of the circumstances and facts in the case the Court deems it unnecessary to discuss the demurrer. Appellants say the decree is contrary to the law and the evidence in the case, and that if the evidence shows any error whatever, in the award, it was a mere error of judgment, without fraud or mutual mistake, and such error is not sufficient to overthrow the award; that the decree erroneously substituted the judgment of Stephen Davidson and H. M. Patton, an architect, for the judgment of the said Stephen Davidson, George Hodgden and C. T. Hickman, acting as sworn appraisers and umpire, respectively. "This is simply to overthrow an award of appraisers duly selected by both parties, and sworn to impartially perform their duties, because an award of two individuals of *ex parte* selection, and not sworn, is inconsistent or in conflict with it;" and that if the award of the appraisers should be set aside for any good reason shown there is no evidence on which to predicate a decree for the full amount of the policies in each company and that it was error to enter such decree.

The principal grounds relied on by the plaintiff's counsel in his brief, as well as oral argument for setting aside the award is the want of notice of the meetings of the appraisers and an

opportunity to be present and present his evidence. There is no allegation in the bill nor complaint therein that he had no notice of such meeting. There is an allegation in the bill that plaintiff "was not called upon nor was he present, although he had expressed a desire to Mr. Davidson to present papers and to offer evidence as to certain facts as before stated." He further alleges "That he was not present at any of the sessions of the said appraisers, nor when they were holding their sessions with the so-called or supposed umpire, that he had requested through Stephen Davidson, one of the appraisers, that inasmuch as the entire inside of the greater and most valuable portion of the building had burned out, and that the facts and circumstances connected therewith as to material, construction, cost and condition was a matter of evidence and could not be determined, seen nor known except from evidence, as to what existed there before the fire and which had been entirely consumed, inclusive of the roof down to the second and first floors, that before the arbitrators concluded, your orator would like to present bills, accounts, plans, specifications and other evidence, if necessary, to inform the appraisers of the character, material and quality of the construction and the property that was consumed in said fire and being a part and parcel of said building; and the said Davidson who had made out the detail statement of loss which accompanied said proofs of loss and which fact was known to said companies before the agreement was made, did come to your orator and get some accounts, but very few, but notwithstanding he took such accounts your orator is informed and believes that the said George Hodgden refused to consider the same or to be informed or advised by what they contained, and also the said umpire, as your orator is informed and believes, refused to consider them, and also refused to hear any evidence of any kind on the part of your orator, claiming that this was an appraisement in which it was not necessary to hear evidence but they were to form their opinion independent thereof from a view of the premises, for which your orator claims they could at most merely theorize and speculate as to many parts and portions of the building, construction and decoration and other details, where the subject itself had been entirely consumed by fire." Stephen Davidson was the builder who made out the proof of loss for the plaintiff after the fire

and was chosen by plaintiff as one of the appraisers and who also had suggested the name of C. L. Hickman for umpire, to be substituted for Mr. Geisey of Wheeling. Mr. Davidson, a witness for plaintiff, testifies that the appraisers had the plans and specifications which he says "were very explicit and plain, by elevation and floor plans and sections and cross sections so that they amply showed every part of the building." He stated that at two or three times he got bills from the plaintiff; that he had the bills for decorations, painting and some lumber bills; they were not all that plaintiff said he had; that the plaintiff said he had other papers that he desired to present as evidence showing the entire construction of the building in detail; that witness presented plaintiff's request to the appraisers and told them that he wanted to be heard before the appraisement was closed. Although plaintiff knew of the meetings and that the appraisers were in session and he presented through Mr. Davidson, one of the appraisers, some papers and bills, yet he did not present himself nor make known to them what particular evidence he desired to present. Plaintiff relies very strongly on the case of *Coons* v. *Coons* (Va.) 28 S. E. 885. That was a case where it was specifically alleged that the umpire or third arbitrator, without giving any notice to plaintiff, and without his knowledge or consent and without hearing any evidence, made up his award solely and exclusively upon statements the two arbitrators made in the absence and without the knowledge of the plaintiff. This cannot apply to the case at bar, when there is no complaint in the bill, whatever, for want of notice of any of the meetings of the arbitrators, with or without the presence of the umpire. It appears that the proofs of loss were made up in the first instance for the plaintiff by Davidson from the plans and specifications of the building, and the same which the arbitrators had before them in making up their award. Appellee also relies upon the case of *McCormick* v. *Blackford, 4,* Grat. 133. That was a case where the arbitrators had adjourned to enable the parties to take the testimony of a particular witness. Before they were to meet again one of the parties wrote to one of the arbitrators requesting them to meet at a time specified; stating that he wished to be present, and that he had papers which would throw light upon the subject. The deposition of the witness for whose testimony the adjournment was

had having been taken the arbitrators, at the request of one of the parties met, and made their award in the absence of the party who had written expressing a wish to be present, and without any notice to him, and before the time he had specified. This was held to be misbehavior in the arbitrators. That could hardly be authority in this case, where the party had full knowledge of the meetings, and did not ask to be present, nor did he ask to present any particular or specific evidence, which he had an opportunity to do if he had seen proper to be present at the meeting of the arbitrators. So in the case of *Halstead* v. *Seaman*, 82 N. Y. 27; 37 Am. R. page 536. In that case the parties entered into an agreement for an arbitration to be "conducted and decided upon the principle of fair and honorable dealing between man and man." On the hearing the parties presented written statements and were heard. Plaintiff on the second and third meetings of the arbitrators offered to produce witnesses, Sheldon and Brown, to contradict the written statements made by the opposite party but the majority of the arbitrators declined to allow it on the ground that it was prohibited by the submission. The lower court sustained the award. See 52 How. Pr. 415. But the same was reversed by the Court of Appeals, as cited above. If plaintiff in case at bar had appeared and offered any definite testimony or evidence proper to be introduced and had been denied the privilege of being heard, this authority would be applicable to his case; but this he failed to do, and contented himself by sending by Davidson papers and bills when called on for them. but did not appear in person or by counsel to offer documentary or other evidence, although he knew the arbitrators were in session, passing upon his rights, pursuant to his agreement submitting same to them. Plaintiff Van Winkle, states in his testimony that he told Hodgden in the presence of Mr. Davidson, that when they made their examination before closing any appraisement he desired to introduce evidence as to certain material and general matters as to such loss. At the time or shortly after there were placed in the hands of the appraisers, the plans of said building together with the specifications under which the building was originally erected; that during the time that they were in session as appraisers Mr. Davidson came to him and wanted some bills which he gave him. They were bills for the decorations of the walls and

the bill of the Parkersburg Mill Company, for the lumber that had gone into the building, and they were returned to him afterwards with the statement that the other appraisers had refused to look at them; that Davidson came to his office several times and requested papers which he did not then recall, outside of the bills mentioned; that he called his attention several times that when they were ready he wanted to insist upon his right to introduce testimony as to what had been destroyed, a great portion of which had been entirely consumed; that he was never permitted to introduce any such testimony, but upon the contrary was very much surprised to receive from Mr. Davidson a purported copy of the appraisement accompanied by the statement that they did not hear any testimony and did not think it necessary. On cross examination he was asked to produce the bills for examination that he had desired to lay before the appraisers. He produced two large packages of bills marked on the back "Academy of Music, Proprietary Vouchers, 1882 to 1889, Package number 1, Package number 2," and stated they extended over the period indicated. When asked what ones of the bills he desired to produce before the appraisers he said he did not know of any particular bill, he was going to use the package as the case required, if the evidence had been admitted; that there were a great many of those bills that were pertinent on the question of price and material but that he had not picked out any of the bills which he desired to submit; that he had given to Mr. Davidson the bills for lumber and the bills in relation to decoration; that Mr. Davidson had come and asked for them. He wanted to take them where the appraisers were in session. He also produced the plans and specifications which were the same that the appraisers had at the time they made the appraisement. It was clearly the duty of plaintiff when he knew the appraisers were in session, considering the matters submitted to them, to lay his evidence before them and offer such oral testimony as he might deem proper to assist the arbitrators to arrive at a just conclusion, and it was not the duty of the arbitrators to send to plaintiff from time to time for such evidence as he might desire to submit. Hodgden, one of the appraisers, testified that he never heard of any request made by the plaintiff to be present at the session of the appraisers. When asked "Were any bills or accounts or plans and specifica-

tions presented by Mr. VanWinkle to the appraisers that you refused to consider?" A. "No, sir; nothing, only Mr. Davidson wanted me to take a lot of bills for lumber, and I said, that, I would not do, because when I see a piece of work right before my eyes, I would not think for a moment to have some one else to come and tell me what that was worth. I would not consider myself a competent appraiser. Some painting, papering and decorations that were destroyed, I did consider the bills for them." Mr. Hickman, the umpire, testifies that there was some little difference between the appraisers as to the value of the painting, papering and decorations—something on that line—and that Mr. Davidson went out somewhere and got a bill for papering, and brought it in, and what arrangement there was made between the appraisers he did not know. It was not referred to him any more. He states that he heard no effort to present any other papers that were refused by the appraisers or by witness and Mr. Hodgden; that he would have no right to refuse any papers offered. He stated that Mr. Davidson and Mr. Hodgden participated in the calculations and measurements and that he never heard or seen anything of Mr. Davidson being excluded from such participation; that witness had had no meetings with Hodgden at which Mr. Davidson was not present or with Davidson when Hodgden was not present. Mr. Davidson was asked what items he and Hodgden disagreed upon in making their calculations. He said, "Well, we disagreed about the brick work; I did not think he was counting brick enough; we disagreed in regard to the galvanized iron work; we disagreed in regard to the papering, and decorating; we disagreed in regard to the stone work and I believe in the painting;" and does not remember whether these were all, they might have been and might not; that when they disagreed and submitted their disagreement to Hickman he always agreed with Hodgden. Hodgden testified when asked about what items he and Davidson disagreed, that the brick work was the main item and he thinks the galvanized iron was another, and he thinks painting too, but that he remembered the brick and galvanized cornice distinctly. And on cross examination Hodgden was asked to specify particularly on what articles of appraisement or materials he and Davidson disagreed and were submitted to the umpire. His answer was, "One of them was the

brick work; that I know very positive, and the galvanized iron; I can't recall any other that we had very much difference regarding. It all went along smoothly; these two items was the only two we had any difference in at all; possibly, there might have been a little difference in the painting, I think he brought your bills over about this papering and painting. There was a talk among all of us together about the papering and painting. I have an idea that we used your bills. I said it was not out of the way very much. I had no word with Mr. Davidson at no time; shook hands and laughed and I supposed that was the end of it." Hickman, the umpire, testified that Mr. Hodgden. Mr. Davidson and himself, went to the building. There seemed to be a difference between the appraisers as to a few—two or three, or four different points. "I don't just remember or recollect except probably three I can recall very distinctly." There were two places in the brick wall—probably three places—they could not agree as to where the wall should come down to, and another difference I remember of passing on was as to the value of the galvanized iron cornice and another as to the value of square feet of the stone coping." He states that the two appraisers pointed out the difference that they desired him to settle. "On the building they spoke as to where the pressed brick front should come down to and also the common brick at the rear of the building. I think there were two places on the rear of the building that was cracked over the window and another place near the rear on the right hand wall as you stand in front of the building, that was in dispute as to where they should come down to to be rebuilt to make it good. That the matter of price of stone coping item was taken up when they were in the building or on the building, but the matter of galvanized iron cornice was taken up at the office; the number of feet was talked of between the two gentlemen, Mr. Davidson and Mr. Hodgden. I remember of taking a catalogue and selecting a cornice of about the same make as the old and deducting the discount on it and fixed the value at that. That was what we done in the office." With reference to the difference as to the walls, he was asked what examination was made by him, when he stated: "Well, I went up through the building, and looked at the building out through the windows, and examined the nature of the crack in the rear wall, and then, we went down on

the ground and around the building and looked from the ground up, and looked also in front, and I fixed the places as to where I considered it right the walls should come down to; and as to the number of brick and the value of the same, to replace the same, I made no estimate. The figuring was done by the appraisers." In *Fluharty* v. *Beatty*, 22 W. Va. 698, (syl. pt. 6), it is held: "If the arbitrators unreasonably refuse to hear competent witnesses offered by either party this is such gross misconduct as to vitiate the award." It is not contended in case at bar that plaintiff offered any particular evidence to the arbitrators which was rejected or that he appeared before them to ask to offer evidence. It is only shown that he told one of the arbitrators that he had bills, etc., that he wished to lay before them, but did not say what they were, and in his deposition states that he did not know what particular bills, but he only expected to offer them as occasion might require. He offered nothing that was rejected. It is shown by the testimony that the bills he placed in the hands of Davidson were considered. In *Stemmer* v. *Insurance Company*, 33 Or. 65, (syl. pt. 8), it is held: "While it is a general rule that if appraisers exclude material testimony it will be fatal to the award, it is also true that testimony must be offered before it can be rejected; so that, where the insured only announces that he was willing to produce witnesses on a certain point, without actually offering them, it can not be said that the arbitrators rejected pertinent testimony." This is about the case here. The plaintiff, without going before the arbitrators or in any way presenting the evidence which he said he had and wanted considered simply intimated to one of the appraisers that he had evidence which he desired them to consider, but never offered it, and certainly he cannot contend that he had no opportunity to offer it. It is alleged in the bill and attempted to be proven that the appraiser, George Hodgden, was incompetent because of partiality; that he himself, had asserted that he was the appraiser in the interest of the insurance companies, and that his conduct was such as to indicate that he considered himself, and was acting as the agent of said companies rather than a disinterested, unprejudiced, impartial appraiser, and that his efforts were to minimize the loss and damages in as far as he possibly could and at the same time pretending to be fair and impartial, and

that his treatment of his co-appraiser, after the umpire was present was to treat him with discourtesy and not consult him in any way and that he and the umpire attempted to make such appraisement independently of the said appraiser, Davidson, and by ignoring him, practically substituting the said umpire who was not in any sense an appraiser and could only pass upon matters of disagreement between the two, in place and stead of said Davidson; that the said appraisers were considering in the office of the agents of said insurance companies in the City of Parkersburg, and that the agents were a part of the time present. Davidson in his testimony for plaintiff was asked what Hodgden said to him or in his presence relative to his business as appraiser of losses, and for whom. A. "Well, of course, he represented that he was here for the insurance companies and was working for them. I do not know that he said that was his business alone. I don't remember that he said anything about having been engaged in that business generally but he spoke several times of having been employed for that business." Did not remember the language he used and did not remember of hearing him say anything about having seen the proofs of loss in the case; but witness's impression was that he had seen them. Davidson states that when Mr. Hodgden first came to Parkersburg witness was sick and could not attend to the business and Hodgden returned to Pittsburg and when he returned the second time he told Hodgden that he couldn't work with Mr. Geisey, who had been chosen umpire, for the reason that he believed he was an expert, following that business; that he thought he got this idea largely from Hodgden's conversation on the previous visit; that Mr. VanWinkle came to his house and he told him he could not work with that man and that Hodgden and he were going to disagree, and that he was not willing to submit to Mr. Geisey and told him he could not serve with Geisey and wanted some one entirely disinterested and who had not been posted; that Hodgden had intimated to him that he had seen and had a conversation with Geisey; did not say so, in just so many words, but led him to believe in his conversation, and in making the calculations, the first thing that Mr. Geisey would agree with him; that Hodgden said he did not expect to consider the walls; that he was going to finish the balance and leave that to the umpire. That was first mention-

ed when they went to the notary's office. They talked there for a while about Mr. Geisey and about the walls, and a question came up about the walls while they sat there and he made the remark that he would not consider them anyhow; that he would go home and submit that matter to the umpire. Q. "You stated before that you and Mr. Hodgden after that, on the same day went up and examined the building and the walls and you could not agree as to the loss." A. "Well, we did not try to agree. I found that his opinion was different from mine in regard to them and we went on with the other work."

Mr. Hodgden in his testimony flatly denies that he intimated to Mr. Davidson that he had seen Mr. Geisey and had a conversation with him, and states that he never met Mr. Geisey and never talked with him on this business and he also denies that he ever said that he did not expect to consider the walls, that he was going to leave that to the umpire, and further stated that he had tried to make the loss as impartial as it was possible to do and tried to fix the value that was right between man and man, that was his purpose; that he never asserted himself to be an appraiser in the interest of the insurance companies and did not attempt to minimize the loss and would have been glad to have come down and repaired the job for the money fixed by the award. He stated that Mr. Davidson assisted in making every item on that award, was there when made and talked it over item by item; that the calculations were not made by Hickman and himself, but by Mr. Davidson when they were figuring together, and when a difference came they submitted to the umpire; that he and the umpire did not treat Mr. Davidson with discourtesy and did not have an unpleasant word from the time they began until they got through. He further testified, on cross examination, that he never saw the proofs of loss in the case nor any part of them; that they were never shown to him and that they would not have influenced him any way; that his business was builder and architect in Pittsburg for about thirty years, and was also engaged in the steam heating business; that he had acted as appraiser, many times, of buildings and had repaired many of them; that he had acted as appraiser on both sides, acting many times for the owners of buildings, but presumed he had acted oftener for insurance companies than for owners. The most of his services as such appraiser had been

rendered in Pittsburg though he had served around in many places; that he had never made appraisements on behalf of the defendant companies; that he had made appraisements for Mr. Cole, who was the agent of one of the defendants. The fact that Hodgden was an experienced appraiser by no means disqualified him   In *Stemmer* v. *Insurance Co., supra*, it is held: "The prior service of an arbitrator in a similar capacity does not render him incompetent, or invalidate an award, in which he joined in the absence of evidence showing that he was prejudiced." The plaintiff employed W. H. Patton, an architect, of Belpre, Ohio, together with said Davidson to make an estimate and calculation of the loss of the building after the rendering of the award and they estimated the whole loss to be $8,013.25.

Mr. Patton testifies that he and Davidson made their "measurements from the original plans and specifications of the old Academy of Music and from personal visits to the building," and he was satisfied that the statement made from the measurements and the visits to the building and careful examination of the plans and specifications, was practically correct; that they were furnished with the memorandum of items of details that it was claimed were used by the appraisers and which they had a part of the time when they were making the calculations; that they had calculated the cost of restoring the walls on the measurements that they had made and the difference between the aggregate found by them and the aggregate in the appraisers' detail to be $837.15. It is alleged in the bill in relation to the repairs of the brick walls in which there was the greatest difference between the estimates made by the award and the subsequent one made by Patton and Davidson, that the appraisers did not use care and proper inspection to ascertain nor saw with any certainty the amount of brick walls that was to come down nor the estimate of the injuries thereto in as much as there was no way for them without getting on a ladder or scaffold to examine the walls that were 20 or 25 feet from any available point and they did not go upon said north wall, and that plaintiff had had calculations made upon the plans as to points at which said wall should be taken down.

On cross examination Mr. Patton stated that he had been employed by Mr. VanWinkle in connection with Mr. Davidson to make the examination; that he thought Mr. VanWinkle had

expressed himself as being dissatisfied with the appraisement made by the appraisers, but he did not know that Mr. Davidson was dissatisfied with it; that he made personal inspection of the walls, but did not get upon it for the reason that they could not get upon it; they went as close to it as they could get. So that it seems their examination was about after the same order as that of the appraisers, none of them got upon the walls and the presumption is that they could sufficiently see the injury to the walls to make a fair estimate and calculation of the damages to the walls from the standpoint occupied by the appraisers. Patton further stated that he and Davidson made the examination before the building was torn down and prepared for reconstruction; that he was employed as architect by Mr. Van Winkle and Mr. Busch to reconstruct the building; that thirteen items included in the estimate made by the witness and Davidson and omitted from the estimate made by the appraisers, they got from the original drawings and specifications and their knowledge of the building and which all appear in the original plans and specifications, but it was possible that the electric light wire cutouts and sockets did not appear in those plans and specifications. Mr. Davidson, the appraiser chosen by Mr. VanWinkle, acted in that capacity with Hodgden as appraiser and Hickman as umpire and signed the award made by the three without any protest, and afterwards was appointed with Mr. Patton, by Mr. VanWinkle to make a second appraisement, (but it does not appear that either Davidson or Patton was sworn under that employment, to act fairly and impartially) and made an appraisement or estimate of the loss far in excess of that made by the appraisers under oath. In *Campbell* v. *Western* 3 Paige. (N. Y. Chancery reports), 124, it is held: "An arbitrator cannot contradict an award which he has signed."

It would seem that the differences in the estimates and calculations between Patton and the appraisers was a mere difference in judgment. The evidence fails to support the charges of fraud and partiality or misconduct and prejudice in the discharge of their duties, either of Hodgden as appraiser or Hickman as umpire. In *Fluharty* v. *Beatty*, 22 W. Va. 698, (syl. pt. 1): "Presumptions are not to be raised for the purpose of overthrowing awards, but the awards are to be liberally construed so as to

give effect and operation to the interests of the arbitrators, where it can be done, and every reasonable intendment is to be made in their support." And point 5, "A court of equity will set aside an award for fraud, collusion, corruption or gross misconduct in the arbitrators." The evidence in the case at bar falls far short of warranting the setting aside of the award in this cause for any such reason as therein stated. In *Wheatley* v. *Martin,* 6 Leigh 62: "It is equally the rule of equity as of law that the reasons for setting aside an award must appear on its face or there must be misbehavior in the arbitrators or some palpable mistake." And in *Bassett* v. *Cunningham,* 9 Grat. 684, the arbitrators and umpire sat together and heard the evidence of which a note was taken by one for the convenience of all. Upon the disagreement of the arbitrators the umpire made his award, in which he did not refer to any of the evidence or state the principle or facts upon which it was based; but in sending his award to the clerk of the court in which the causes were pending he sent with it all of the papers and the note of the evidence taken before the arbitrators. These papers and evidence were held, not a part of the award or connected with it, so that they might be considered upon a motion to set aside the award, and it was further held, that an error of judgment on the part of the umpire in regard to the facts was not ground for setting aside the award. In *Morris* v. *Ross,* 2 H. & M. 408, it is held: "An award ought not to be set aside either in a court of law or equity on the ground of mistake in the judgment of the arbitrators, unless that mistake be very palpable; a mere difference of opinion between the court and the arbitrators in a doubtful case not being sufficient to authorize such interference." It is said in brief of counsel for appellee that he "was not heard although on learning of the session of umpire and appraisers he demanded opportunity to be heard and present his case." It appears from the record that while there was no formal notice given to plaintiff of the meetings of the appraisers he had every opportunity to have appeared before them and presented any evidence that he desired. In his testimony appellee says "during the time that they were in session as appraisers Mr. Davidson came to me and wanted some bills which I gave him." Then he further says: "Mr. Davidson came to my office several times and requested papers which I do not recall

exactly, outside of the bills mentioned; but I called his attention several times that when they were ready I wanted to insist upon my right to introduce testimony as to what had been destroyed, a great portion 'of which had been entirely consumed." So it appears from his own testimony that instead of attending to his business and presenting his claims before the arbitrators he remained in his office and did not pretend to present anything except what was called for. Mr. Davidson going to his office from time to time and getting from him only what was asked for. It is claimed by appellee that the findings as to sound value are erroneous and fraudulent. I am unable to see the materiality of the sound value. The question is, really, what would it cost to put the building in the condition in which it was before the fire. This is an independent proposition, to replace the damaged part, and that which was totally destroyed. Appellee also cites *Insurance Company* v. *Board of Education,* 49 W. Va. 360, where the bids or proposals made to restore the building were treated as the best evidence of the amount to be recovered. In that case bids were advertised for and accepted for restoring the property to its condition prior to the fire. The bids were made by responsible parties, and made in good faith, and were the best evidence that could have been adduced of the loss. In case at bar it never was proposed to restore the building in the same way it had been, but it was built upon a different plan, and for different purposes.

Judging from plaintiff's conduct in the matter it would seem that his "case is plainly within the sound proposition of Judge Kent in *LaGuen* v. *Gouverneur* & *Kemple,* 1 John's. Cas. 502, when he says: 'Every person is bound to take care of his own rights and vindicate them in due season and in proper order. This is a sound and salutary principle of law. Accordingly, if a defendant having the means of defense in his favor neglects to use them and suffers a recovery to be had against him by a competent tribunal he is forever precluded.' And he cited 2 Burrows, 1009, 7 Term Rep. 269; 2 H. Bl. 414. He also there cites the authorities at length showing how firmly this principle is adhered to in courts of equity as well as law." As stated in *May* v. *Miller,* 59 Vt. 577. The action of plaintiff in keeping aloof from the arbitrators when he had knowledge and notice of their proceedings and furnishing items of evidence

only as it was called for would suggest the policy, on his part, of attempting to place himself in such position that in case the award should be favorable to him he could have the benefit of it and if it failed to meet his approval he could contest it for want of formal notice, or other grounds.

For the reasons herein stated the decree of the circuit court of Wood county is reversed and set aside and the bill dismissed, reserving to plaintiff the right to prosecute any suit or proceeding he may be advised to institute, not inconsistent with the award.

*Reversed.*