364 S.E.2d 786

**Carson W. BRYAN**

**v.**

**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, etc., et al.**

**No. 16831.**

Supreme Court· of Appeals of West Virginia.

July 16, 1987.

Robert A. Yahn, Wheeling, for appellant.

Herbert G. Underwood, Clarksburg, Frederick Stamp, Wheeling, for Massachusetts Mut. Life.

William Watson, Wellsburg, for P. Kirby.

Jeremy McCamic, Wheeling, for Gunther/Roberts.

James McDermott, Wheeling, for J. Weaver.

James Haranzo, Wheeling, for F. Joanou.

Gilbert Bachmann, Wheeling, for R. Riley.

PER CURIAM:

This is an appeal by Carson W. Bryan and his brothers, Taft G. Bryan and Baron A. Bryan, from summary judgment rulings entered by the Circuit Court of Ohio County in three related cases. The cases involve the right of the Massachusetts Mutual Life Insurance Company to terminate its contractual relationships with the appellants. They also involved certain tortious interference and libel claims. On appeal the appellants assert that the trial court erred in entering summary judgment. After examining the record, we believe that one of the appellants' contract assertions has merit, and we reverse on that point.

The Massachusetts Mutual Life Insurance Company is a "general agency" insurance company which does business by contracting with a "general agent" who, in a specific geographical area, subcontracts with subagents known as "career agents." The insurance company does not contract directly with the career agents.

Prior to 1980, Massachusetts Mutual operated through one general agent in the State of West Virginia, but maintained two territories within the State, one called the Wheeling General Agency and the other called the Charleston General Agency. Charles Pearcy, who was stationed in Charleston, was the company's general agent for both the Wheeling and Charleston agencies. In 1973 Carson W. Bryan entered into a contract with Mr. Pearcy to sell insurance for Massachusetts Mutual in West Virginia as a career agent. Certain of the defendants below, Frank Joanou, Phillip C. Kirby, Roger G. Roberts, and Gordon B. Guenther, had also contracted with Mr. Pearcy to sell insurance for Massachusetts Mutual as career agents.

Sometime prior to April, 1979, Massachusetts Mutual learned that Mr. Pearcy was contemplating retirement as general agent for the State of West Virginia. Consequently, in April, 1979, the company decided to appoint Carson W. Bryan as co-general agent for the company in the State with the apparent purpose of preparing him to replace Mr. Pearcy. Mr. Bryan was stationed in Wheeling rather than in Charleston where Mr. Pearcy conducted his business.

Following the appointment of Mr. Bryan as co-general agent, Mr. Roberts, Mr. Joanou, and Mr. Guenther, who, according to some evidence, had apparently resisted Mr. Bryan's promotion, continued to place their Massachusetts Mutual policies through Mr. Pearcy at the Charleston General Agency rather than through Mr. Bryan at the Wheeling General Agency. Mr. Kirby, on the other hand, commenced placing his business through Mr. Bryan at the Wheeling agency.

In the spring of 1979, Massachusetts Mutual received various complaints from Mr. Bryan concerning Mr. Guenther. The company also learned that Mr. Roberts preferred not to do business with Mr. Bryan in Wheeling. Consequently, Massachusetts Mutual granted permission for the establishment of a district office of the Charleston General Agency in Wheeling so that Mr. Roberts and Mr. Guenther could place all their business through the Charleston agency.

On April 1, 1980, the Massachusetts Mutual officially appointed Mr. Bryan sole general agent for the Wheeling agency and at the same time appointed Mr. Robert L. Riley sole general agent for the Charleston agency. Thus, what had been two unified general agencies was divided into two independent general agencies. Massachusetts Mutual's general agency contract with Mr. Bryan was an "at will" contract which allowed either party the right to terminate at any time.

In March, 1981, Mr. Kirby, who had been placing his business through Mr. Bryan in Wheeling, and Mr. Weaver, another career agent who had been placing his business through Mr. Bryan, decided to transfer their business from the Wheeling agency and placed it with the Charleston agency.

Following the abandonment of the Wheeling agency by Mr. Kirby and Mr. Weaver, Massachusetts Mutual became concerned over the deterioration of the business of the Wheeling agency, and on April 14, 1981, the regional vice president for Massachusetts Mutual met with Mr. Guenther, Mr. Roberts, Mr. Joanou, and Mr. Riley at a country club in Wheeling to discuss the company's business in West Virginia. During the meeting Mr. Roberts, Mr. Guenther, and Mr. Joanou questioned the decision of the company to retain Mr. Bryan as general agent for the Wheeling agency. They also questioned his ability to work with people and his business judgment. Later, on April 16, 1981, the vice president met with Mr. Bryan. Mr. Bryan accused Mr. Kirby and Mr. Weaver of disrupting his agency and of not advising him of their plan to move their insurance business.

As a result of the meetings, the vice president reported to Massachusetts Mutual that Mr. Bryan was not doing well as general agent and also reported that Mr. Roberts, Mr. Guenther, and Mr. Joanou had reached the point where they had lost respect for the home office's judgment. As a consequence, in November, 1981, Massachusetts Mutual, acting on the advice of its vice president, decided to close the Wheeling agency and to terminate Mr. Bryan's contract as general agent.

Two of Mr. Bryan's brothers, Baron A. Bryan and Taft G. Bryan, who are also appellants in the present proceeding, were career agents contracting through Mr. Bryan at the time Mr. Bryan's general agency contract was terminated. The express terms of Mr. Bryan's general agency contract provided that if the Massachusetts Mutual terminated his contract, all subagents contracting with him were automatically terminated.

Following the termination of Mr. Bryan's general agency agreement, the vice president investigating the situation was in favor of retaining Mr. Bryan's brothers as career agents, but Mr. Guenther, Mr. Joanou, and Mr. Roberts opposed the relationship. When asked, they openly expressed their opposition. Because of their opposition, the Bryan brothers were not retained.

Upon the dismissal of the Bryans, Massachusetts Mutual sent a letter to its policyholders notifying them of the action. The letter said:

Dear Policyholder:

This is to inform you that Baron, Carson and Taft Bryan are no longer associ-

ated with the Massachusetts Mutual Life Insurance Company.

You were recently informed of the transfer of your records to our Charleston General Agency (Robert L. Riley, C.L.U., General Agent). This will assure you of uninterrupted service. Shortly, Mr. Riley will assign one of his Wheeling agents to handle your service requests, or you may choose any other of his agents if you prefer.

Your Massachusetts Mutual Insurance provides you with quality coverage. If anyone should ever suggest that you replace it with other insurance or that you borrow against it to buy new insurance, please let your new Massachusetts Mutual agent know. Since it is not usually in your best interest to replace existing insurance, we would appreciate the opportunity to discuss the situation before you make a final decision.

We look forward to serving you in the future.

> Sincerely,
> /s/ Gerald Doten
> Gerald Doten, C.L.U.
> Second Vice President

Following the termination of their contracts with Massachusetts Mutual, Carson W. Bryan, Taft G. Bryan, and Baron A. Bryan filed similar actions in the Circuit Court of Ohio County against the insurance company and against Phillip C. Kirby, Roger G. Roberts, Gordon R. Guenther, Frank Joanou, Robert L. Riley, and James L. Weaver. Although the cases were not formally consolidated, by agreement of counsel the cases were presented jointly.

In their complaints, as amended, the Bryans alleged that Massachusetts Mutual had wrongfully terminated its general agency contract with Carson W. Bryan, and that certain of the individual defendants had conspired to close the Wheeling General Agency in violation of Chapter 33, article 11 of the West Virginia Code. They complained that the company had improperly failed to continue the Bryans as career agents after the terminations of Carson W. Bryan as general agent for the Wheeling agency. They also charged that Massachu-

setts Mutual had committed libel by distributing the letter regarding the termination of their employment. Finally, they asserted that the individual defendants had tortiously interfered with Carson W. Bryan's contractual relations with Massachusetts Mutual.

After extensive discovery and pretrial procedure, summary judgment motions were filed on behalf of all the defendants except the defendant Riley. After additional discovery, the court, on February 7, 1985, granted the motions. It is from that ruling that the appellants, the Bryans, now appeal.

The appellants' first assertion is that their contractual relationship should be interpreted under the laws of the State of Massachusetts and that under the laws of Massachusetts they are entitled to recover because Massachusetts law provides that at-will employment contracts contain implied covenants of good faith and fair dealing and that terminations not made in good faith constitute a breaches of contract.

Massachusetts Mutual and the other appellees do not take issue with the appellants' assertion that their contractual relationships should be interpreted under the laws of the State of Massachusetts. Carson W. Bryan's general agency contract with Massachusetts Mutual specifically provided in paragraph 26 that:

> *Interpretation*—This contract shall be interpreted in accordance with the laws of the Commonwealth of Massachusetts.

In *General Electric Co. v. Keyser*, 166 W.Va. 456, 275 S.E.2d 289 (1981), the Court recognized that a contractual choice of law provision selected by the parties to the contract will be upheld unless the chosen state has no substantial relationship to the parties to the transaction or unless the application of the law of the chosen state would be contrary to the fundamental public policy of the state whose law would apply in the absence of a choice of law provision. This Court believes that Massachusetts does have a substantial relationship to the parties to the present controversy and that there is no fundamental public

778

policy of West Virginia would be violated by the application of Massachusetts law.

It appears that for many years an employment contract which was "at will" could be terminated in Massachusetts by either side without reason. *See Fenton v. Federal St. Bldg. Trust*, 310 Mass. 609, 39 N.E.2d 414 (1942); *Mechanic's Foundry & Mach. Co. v. Lynch*, 236 Mass. 504, 128 N.E. 877 (1920); *Gebhard v. Royce Aluminum Corp.*, 296 F.2d 17 (1st Cir.1961).

However, in the seminal case of *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977), the Supreme Judicial Court of Massachusetts, Norfolk, indicated that parties to at will employment contracts were required to act in good faith and with fair dealing toward each other. The court stated:

> Good faith and fair dealing between parties are pervasive requirements in our law; it can be said fairly, that parties to contracts or commercial transactions are bound by this standard.

373 Mass. at 102, 364 N.E.2d at 1256. *See also, Cort v. Bristol–Myers Co.*, 385 Mass. 300, 431 N.E.2d 908 (1982).

In the case of *Gram v. Liberty Mutual Insurance Co.*, 384 Mass. 659, 429 N.E.2d 21 (1981), the Supreme Judicial Court of Massachusetts, Middlesex, confronted the question of whether a discharged insurance agent was entitled to damages for termination of an at-will employment contract. While stressing that normal contract damages are available in an at-will contract situation only when the discharge is motivated by some cause contrary to public policy, the court found that the insurance agent's situation presented a special problem. The evidence showed that the past efforts of the agent had produced business on which he potentially would have received commissions in the future if he had remained in the employment of the company. The evidence also suggested that the company potentially would have been enriched by the retention of the agent's renewal commissions as a result of the termination of the agent's employment. The court found that the possibility of the un-

earned benefit inuring to the company required a special rule:

> We think that the obligation of good faith and fair dealing imposed on an employer requires that the employer be liable for the loss of compensation that is so clearly related to an employee's past service, when the employee is discharged without good cause.

384 Mass. at 672, 429 N.E.2d at 29. In applying the rule in the *Gram* case, the court concluded that even though Liberty Mutual Insurance Company had discharged Gram without violating some public policy, it had benefited from the discharge, and Gram was accordingly entitled to the value of renewal commissions which he could reasonably have expected to receive. The case was remanded for the development of evidence on the question of the value of those commissions.

In *Gram v. Liberty Mutual Insurance Co.*, 391 Mass. 333, 461 N.E.2d 796 (1984), a sequel to the original case, the court was called upon to clarify what commissions would entitle the agent to damages. The court concluded:

> Although the question is not free from doubt, we conclude that commissions on future endorsements and the consequences of any anticipated future inflation should not be included in the measure of Gram's damages. Future policy changes and future premium levels are speculative. We think that Gram's damages should be measured by the amount of annual renewal commissions payable under his compensation agreement in effect at the time of his discharge, recognizing the renewal of coverage but disregarding the effect of endorsements. Attrition in the block of business produced by Gram should be determined for each future year of his anticipated employment, and anticipated future renewal commissions should be adjusted to present value. The calculation of Gram's damages should also reflect the proportion of Gram's time that would have been devoted to servicing renewal policies, but, because we exclude the effects of endorsements in measuring the renewal commissions recoverable, the portion of

Gram's time reasonably expected to be devoted to servicing renewals should not include time devoted to handling endorsements.

391 Mass. at 337, 461 N.E.2d at 799.

It thus appears that under Massachusetts law an at-will employee may be discharged without cause so long as the employer acts in good faith and engages in fair dealing and does not violate some public policy. However, Massachusetts law also appears to recognize that where a discharge without cause is motivated by financial considerations other than considerations which violate some public policy, fair dealing and good faith require that the employee be compensated for loss of compensation which is clearly related to the employee's past service. In the second *Gram* case the Massachusetts court detailed what constituted compensation clearly related to an insurance agent's past service and detailed the manner in which compensation for that loss of compensation should be calculated.

■ In syllabus point 3 of *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963), this Court announced a rule regarding summary judgment which has been consistently followed:

A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.

See *Lowery v. Raptis,* 174 W.Va. 736, 329 S.E.2d 102 (1985); *Karnell v. Nutting,* 166 W.Va. 269, 273 S.E.2d 93 (1980); *Consolidated Gas Supply Corp. v. Riley,* 161 W.Va. 782, 247 S.E.2d 712 (1978); *Anderson v. Turner,* 155 W.Va. 283, 184 S.E.2d 304 (1971).

■ In the case presently under consideration, while the documents filed fail to show that the appellants were discharged for reasons contrary to public policy, the evidence does suggest that they had worked for Massachusetts Mutual for a considerable period of time and that they had generated potential commission income payable in the future. Since Massachusetts law, the law under which the contract issue is to be construed, provides that under certain circumstances an at-will employee discharged is entitled to be compensated for loss of compensation which is clearly related to his past service, this Court believes that the evidence should be substantially developed on the circumstances surrounding the appellants' discharge and on the question of whether the appellants had potential future income clearly attributable to their past service. Certainly, the development of the facts is desirable to clarify the application of the Massachusetts law. For this reason, this Court believes that the judgment of the Circuit Court of Ohio County should be reversed under the holding in *Aetna* and the case should be remanded for additional development of the facts.[1]

The appellants next assert that Mr. Kirby, Mr. Roberts, Mr. Guenther, Mr. Joanou, Mr. Riley, and Mr. Weaver tortiously interfered with their contracts with the Massachusetts Mutual Insurance Company and that they should be held liable for the damages caused by their conduct.

■ Recently in the case of *Torbett v. Wheeling Dollar Savings & Trust Co.,* 173 W.Va. 210, 314 S.E.2d 166 (1983), this Court discussed the law in West Virginia relating to tortious interference with business relationships. In syllabus point 2 of that case, the Court stated:

To establish prima facie proof of tortious interference, a plaintiff must show:

(1) existence of a contractual or business relationship or expectancy;

---

1. As a corollary to their argument that their discharge was wrongful, the appellants argue that the at-will termination provision contained in their contract with Massachusetts Mutual was void.

Massachusetts, as discussed in the body of the opinion, has recognized that at-will employment contracts are valid but contain an implied covenant of good faith and fair dealing which must limit and temper any action taken under the contract.

(2) an intentional act of interference by a party outside that relationship or expectancy;

(3) proof that the interference caused the harm sustained; and

(4) damages.

If a plaintiff makes a prima facie case, a defendant may prove justification or privilege, affirmative defenses. Defendants are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper.

■ The evidence in the case presently under consideration shows that the individual defendants charged with tortious interference were operating in the same general geographic territory as the appellants. The individual defendants, who all received commission income from Massachusetts Mutual, certainly had a financial interest in Massachusetts Mutual's business. Also, they were attempting to influence Massachusetts Mutual in matters in which they had a business interest. Because of these factors, we believe that under the *Torbett* test the appellants' tortious interference claim is without merit.

The appellants also argue that the letter sent by Massachusetts Mutual Insurance Company to its policy holders regarding the termination of their employment was defamatory and that it and the individual appellees in this case should be held responsible for the resultant damages.

■ In the case of *Crump v. Beckley Newspapers, Inc.*, 173 W.Va. 699, 320 S.E.2d 70 (1984), this Court discussed the elements of defamation and concluded in syllabus point 1 that:

The essential elements for a successful defamation action by a private individual are (1) defamatory statements; (2) a nonprivileged communication to a third par-

ty; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury.

Under this case, before a statement can be considered defamatory, it must be false.

■ An examination of the letter, which is at the heart of the appellant's assignment of error, indicates that the letter is truthful. Paragraph 1 of that letter stated that the appellants were no longer associated with the Massachusetts Mutual Life Insurance Company at the time the letter was sent. According to the uncontradicted evidence in the case, that was a fact. Paragraph 2 stated that the policy holder's records had been transferred to the Charleston General Agency and that an agent would be appointed to handle the policy holder's account. There is no evidence that that paragraph was untrue, and even if it was, it was not a defamatory assertion. The final two paragraphs stated that Massachusetts Mutual provided quality service and that if anyone suggested that the policy holder replace it with other insurance Massachusetts Mutual would appreciate the opportunity to discuss the situation. The final paragraph also stated that Massachusetts Mutual looked forward to serving the customer in the future. These paragraphs contain no blatantly untruthful statement, and they set forth general matter covered by West Virginia law relating to disclosure to be forwarded by life insurance agents to policy holders who are urged by the agents to replace existing life insurance with that of a competing company.

The appellants lastly argue that Mr. Kirby, Mr. Roberts, Mr. Guenther, Mr. Joanou, Mr. Riley, Mr. Weaver, and Massachusetts Mutual Insurance Company violated provisions of the West Virginia Code relating to unfair trade practices in the insurance industry.

■ West Virginia Code § 33–11–4(3) prohibits the dissemination of a statement within the insurance industry which is maliciously critical of or derogatory to the financial condition of any person which is calculated to injure such person. The ap-

pellants claim that the letter sent by Massachusetts Mutual to its policy holders, quoted above, was maliciously critical and derogatory to them and was calculated to injure them. As already discussed, in this Court's opinion the contents of that letter were not defamatory and were not such as was improper, given the circumstance of the appellants' relationship with the company. The appellants also argue that W.Va. Code § 33–11–4(4), which makes it illegal for any person to commit an act of boycott, coercion or intimidation in restraint of or in monopoly of the insurance business, was violated by the letter. The Court does not see how the letter which Massachusetts Mutual sent can be construed as an act of boycott, coercion or intimidation.

For the reasons stated, the judgment of the Circuit Court of Ohio County is affirmed as to the individual defendants. As to Massachusetts Mutual, the judgment is reversed, and this case is remanded for further development consistent with the principles set forth herein.

Affirmed in part, reversed in part, and remanded.