54 F.3d 775
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES STEEL MINING COMPANY, INCORPORATED, a
corporation, Plaintiff-Appellee,
v.
Dino MITROS, Husband; Hilda Mitros, Wife, Defendants-Appellants.
 No. 94-1917.
 United States Court of Appeals, Fourth Circuit.
 Argued Feb. 1, 1995.
Decided May 22, 1995.
 
 ARGUED: John Thomas McFerrin, Beckley, WV, for Appellants. Michael Bruce Victorson, ROBINSON & MCELWEE, Charleston, WV, for Appellee. ON BRIEF: W. Bradley Sorrells, ROBINSON & MCELWEE, Charleston, WV, for Appellee.
 Before MICHAEL and MOTZ, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 OPINION
 PHILLIPS, Senior Circuit Judge:
 
 
 1
 Dino and Hilda Mitros appeal from the district court's grant of summary judgment to U.S. Steel Mining Company ("USM"), which dismissed the Mitroses' counterclaims against USM for trespass and interference with receipt of royalties. Finding no error, we affirm.
 
 
 2
 * The Mitroses are residents of West Virginia. By deed dated 1973, Hilda Mitros acquired the surface rights and the oil and gas rights of a parcel of real property in Wyoming County, West Virginia. In 1988, she and her husband, Dino Mitros, leased the oil and gas rights to EMAX Oil Company ("EMAX") in return for the payment of royalties.
 
 
 3
 USM is a Delaware corporation with its principal place of business in Pennsylvania. It acquired the rights to the coal reserves underlying the Mitroses' property by a long-term lease dated 1961 ("the Lease") from a corporation that itself acquired the coal rights by a severance deed dated 1955 ("the Severance Deed").
 
 
 4
 When EMAX announced plans to develop the property for natural gas production, USM and EMAX disputed whether the presence of gas wells on the property would unduly interfere with USM's coal rights. The West Virginia Shallow Gas Well Review Board ("the Board") resolved the dispute by ordering that EMAX receive a permit for two wells. Accordingly, EMAX installed two wells on the prop erty. The Board also ordered that USM could not mine within fifty feet of EMAX's gas wells. Because one of USM's coal deposits, worth approximately $16,000,000, was in close proximity to one of EMAX's wells, the Board's order would have forced USM to forego mining that deposit. To avoid the loss, USM negotiated a contract ("the Agreement"), dated 1992, pursuant to which it would pay EMAX $25,000 in exchange for the right to "shut in" the well for a two-month period.[1]
 
 
 5
 USM attempted to exercise that right in 1993, but Hilda Mitros interfered with the activities of its employees, threatening violence and preventing the drilling of a degasification hole on adjoining property.[2] USM instituted the present action, seeking an injunction against the Mitroses' interference with its activities. The district court awarded a preliminary injunction, and USM was able to enter onto the property, shut in the well, mine the coal, and restore the well to complete operation. USM's concerns were thereby met.
 
 
 6
 The Mitroses filed various counterclaims against USM, seeking compensation for damage to their land allegedly caused, inter alia, by USM's shutting in the well without legal right, which led to a loss of royalties received from EMAX, and by USM's trespass on the surface of their property when shutting in the well. The district court granted USM's motion for summary judgment, dismissing both claims with prejudice. It held that the Mitroses did not have a viable trespass claim because USM never "entered upon the Mitros' land other than when it was exercising its contractual right to enter upon the Mitros' land for the legitimate purpose of mining coal." J.A. 121. It also held that the Mitroses had "no valid claim for lost royalties against USM since ... USM had a contractual right to temporarily shut in a gas well so that it could continue with its mining operations." Id. The court accordingly found that there was no genuine issue of material fact necessitating a trial on either claim. On this appeal, the Mitroses challenge the district court's ruling against them on both claims.
 
 II
 
 7
 Before addressing the merits of the two claims, we make the preliminary observation that USM's rights to go onto the land in question and take action in furtherance of its coal mining operation derive from two sources. It has rights granted contractually and rights incident to its ownership of the coal underlying the land. Owners of minerals underlying land possess the right, incident to their ownership, "to use the 'surface' of the land in such manner and with such means as would be fairly necessary for the enjoyment of the mineral estate." Squires v. Lafferty, 121 S.E. 90, 91 (W. Va.1924) (cited in Adkins v. United Fuel Gas Co., 61 S.E.2d 633, 636 (W. Va.1950) and other cases). Under West Virginia law, lessees of coal rights stand in the shoes of coal owners. Charter v. Maxwell, 52 S.E.2d 753, 759 (W. Va.1949). USM, therefore, as coal lessee of the coal underlying the Mitroses' property, has the right to such use of the surface of the Mitroses' land as is fairly necessary to mine its coal.
 
 
 8
 In addition, under various contracts between the several owners of property interests in the land in question USM has certain rights of use that may or may not lie within its common law right to make "fairly necessary" use of the surface of the land. Specifically, the Severance Deed grants to USM's lessor
 
 
 9
 the right to ... remove and extract ... all of the coal ... in said land ...; to construct, operate and forever maintain through, over and under said land mining openings, haulways and other ways, ... and all other facilities that are now and may hereafter become necessary or convenient for the ... removal and transportation of all of the coal ...; and such other rights and privileges as may be necessary or convenient for the exercise of all of the rights and privileges herein granted, all without liability for damage and injury to said land....
 
 
 10
 Exhibit Volume at tab 2. The Lease assigns these rights to USM. Ex. Vol. at tab 4. The Agreement grants to USM the right to enter onto the property on which the said wells are situated, and the right to enter into the said gas wells to plug the same; the right to remove equipment therefrom; ... and the right to take all such further acts as are necessary or convenient to further the purposes of this Agreement.
 
 
 11
 Ex. Vol. at tab 5. In light of these provisions, USM has the right, not only to use the surface of the land as is fairly necessary to extract its coal, but also to construct and use "ways" on the land as is convenient without liability for damage to the land and to go onto the land and shut in EMAX's gas wells. Of course, USM may exercise these contractually granted rights only "for purposes reasonably necessary to the extraction of" its coal. Buffalo Mining Co. v. Martin, 267 S.E.2d 721, 723 (W. Va.1980). So, for instance, it may not build a road or shut in a gas well except to facilitate the extraction of its coal.
 
 III
 
 12
 We review grants of summary judgment de novo. Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 938 (4th Cir.1991). The proper inquiry upon such review is not whether we think "the evidence unmistakably favors one side or the other but whether a fairminded jury could return a verdict for the [nonmoving party] on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The moving party is "entitled to judgment as a matter of law" if there is " 'no genuine issue as to any material fact.' " This is the case when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (citing Rule 56(c) of the Federal Rules of Civil Procedure). Because the Mitroses cannot establish at least one essential element of each of their claims, both the trespass claim and the lost royalties claim were properly dismissed via summary judgment.
 
 
 13
 Under West Virginia law, the tort of trespass is defined as "an entry on another man's ground without lawful authority, and doing some damage, however inconsiderable, to his real property." Hark v. Mountain Fork Lumber Co., 34 S.E.2d 348, 352 (W. Va.1945) (quoting 3 William Blackstone, Commentaries *209) Thus, for the Mitroses to survive USM's summary judgment motion, they must make a showing sufficient to establish that USM had no right to be on their property. However, they failed to make such a showing.
 
 
 14
 As explained above, incident to its ownership of the coal, USM had the right to go onto the land and to use the surface of the land as was fairly necessary to mine its coal. In addition, USM contracted for the specific right to go onto the land for the purpose of shutting in EMAX's gas well to enable it to mine a valuable coal deposit. Pursuant to these rights, USM was "legally authorized" to enter the property when it did. Consequently, the Mitroses cannot establish an essential element of their trespass claim--that USM's entry onto their land was without lawful authority. Therefore, all other facts are rendered immaterial, and USM is entitled to judgment as a matter of law.
 
 
 15
 The lost royalties claim is similarly doomed. Under West Virginia law, the cause of action which most closely fits the allegations of the Mitroses is the tort of intentional interference with a business relationship. To prevail on that claim, the Mitroses must prove the following elements: (1) the existence of a contractual relationship with EMAX whereby EMAX was obligated to pay them royalties; (2) an intentional act of interference with that relationship by USM; (3) damages (i.e., loss of royalties); and (4) that USM's interference caused the damages. C.W. Devel't v. Structures, Inc., 408 S.E.2d 41, 44 (W. Va.1991); Bryan v. Massachusetts Mut. Life Ins. Co., 364 S.E.2d 786, 792 (W. Va.1987); Water Eng'g Consultants, Inc. v. Allied Corp., 674 F.Supp. 1221, 1225 (S.D.W. Va.1987).
 
 
 16
 The Mitroses failed to make a showing sufficient to establish the element of intent. USM did not enter the Agreement with EMAX for the purpose of interfering with the royalty arrangement. Rather, any interference was incidental to the legitimate purpose of the Agreement--to facilitate the shut-in of the well, an act necessary to ensure the safe mining of USM's coal. "Tortious interference requires a purposeful wrongful act without justification or excuse." Water Eng'g Consultants, 674 F.Supp. at 1225. "Defendants are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and them selves, their financial interest in the induced party's business, ... or other factors that show the interference was proper." C.W. Devel't, 408 S.E.2d at 44; Bryan, 364 S.E.2d at 793. In the present case, the cause of any loss of royalties was the two-month shut-in of the gas well. As discussed above, USM made an adequate showing that it was justified in shutting in the well. Its Agreement with EMAX bestowed the contractual right to shut in the well. Moreover, USM had the right, incident to its ownership of the coal, to do what was reasonably necessary to mine the coal, and contracting for the right to shut in the well was a reasonable means to recover a valuable deposit of coal that it otherwise would have had to abandon. Therefore, because USM had a legal right to shut in the well, it was justified in having done so and is not liable for any incidental, temporary interference with the Mitroses' collection of royalties therefrom.
 
 
 17
 AFFIRMED.
 
 
 
 [1]
 "Shutting in" a gas well entails temporarily plugging the well at a level below the grade of the coal to be mined and then removing all pipe above that level so that the pipe will not be damaged by subsidence
 
 
 [2]
 A degasification hole allows methane to escape from a mine so that it can be operated safely. The Mitroses were trying to prevent USM from drilling one on land that was leased to USM and in which the Mitroses had no legal interest