**WOOD COUNTY AIRPORT AUTHORITY**

v.

**CROWN AIRWAYS, INC., a Pennsylvania corporation, and Mesa Airlines, Inc., a New Mexico corporation dba Liberty Express Airlines.**

No. 6:95–0518.

United States District Court, S.D. West Virginia, Parkersburg Division.

March 25, 1996.

John S. Bailey, Jr., Bowles, Rice, McDavid, Graff & Love, Parkersburg, WV, for plaintiff.

Stephen R. Crislip, Jackson & Kelly, Charleston, WV, John B. Veach III and David A. Super, Baker & Botta, Washington, DC, for defendants.

## *MEMORANDUM OPINION AND ORDER*

HADEN, Chief Judge.

Pending is Defendants' Motion for Summary Judgment. The parties have submitted memoranda in support of their respective positions and the matter is mature for the Court's consideration. Based on the absence of a genuine issue of material fact and the law, the Court **GRANTS** the motion.

### I.

### THE STANDARD

Under *Rule* 56(c) of the *Federal Rules of Civil Procedure,* summary judgment is proper only:

> "If the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."

Fed.R.Civ.P. 56(c). A principal purpose of summary judgment is to isolate and dispose of meritless litigation. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party has the burden of initially showing the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its initial burden, the burden shifts to the nonmoving party to "establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. To discharge this burden, the nonmoving party

cannot rely on its pleadings but instead must have evidence showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

"Unsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987). Further, evidence that would be inadmissible at trial may not be considered.[1] Fed.R.Civ.P. 56(e); *Anheuser–Busch, Inc. v. Natural Beverage Distrib.,* 69 F.3d 337, 345 n. 4 (9th Cir.1995); *Horta v. Sullivan,* 4 F.3d 2, 8 (1st Cir.1993) (In deciding motion for summary judgment, inadmissible evidence may not be considered. " 'Mere allegations, or conjecture unsupported in the record, are insufficient to raise a genuine issue of material fact.' ") (quoting *August v. Offices Unlimited, Inc.,* 981 F.2d 576, 580 (1st Cir.1992)); Charles A. Wright & Arthur R. Miller, 10A *Federal Practice and Procedure* § 2727, at 156 (1983) ("Material that is inadmissible will not be considered on a motion for summary judgment because it would not establish a genuine issue of material fact if offered at trial and continuing the action would be useless.").

## II.

## THE UNDISPUTED FACTS

Wood County Airport Authority ("the Airport Authority") operates the Wood County Airport ("the airport") near Williamstown, West Virginia. From the early 1980's to the early 1990's, Crown Airways, Incorporated ("Crown") was a commercial air carrier providing commercial air service to and from the airport. For over a decade, Crown leased and occupied Hangar 5 at the airport. During that period, the Airport Authority and Crown enjoyed a productive working relationship.

In the late 1980's, around the time Crown and the Airport Authority were negotiating the renewal of Crown's existing lease, Crown sought expansion of its operations. Crown informed the Airport Authority it would be acquiring two new 360 Shorts aircraft. These larger airplanes required more space than was available in the existing hangars at the airport. In 1989 and 1990, the parties began discussing the possibilities of either enlarging Hangar 5 or constructing a larger hangar to be known as Hangar 6.

In the spring of 1990, a local engineering firm advised the parties modifying Hangar 5 was not feasible. The parties elected to proceed with the construction of a new hangar. The Airport Authority began pursuing funding for the project and, by the summer of 1991, obtained commitments for much of the financial resources necessary for construction.[2]

The parties executed a Lease Agreement ("Lease") for Hangar 6 on December 14, 1992. The term of the Lease commences on the date of occupancy and extends for a period of fifteen (15) years thereafter. The Lease was drafted by Robert Tebay, house counsel to the Airport Authority and *ex officio* member of its board. This document is the primary focus of the controversy.

Carolyn Strock, Manager of the Airport Authority, and Mr. Tebay testified Crown's obligations under the Lease were limited to the payment of rent and utilities and other incidental obligations. Ms. Strock and Mr. Tebay further admitted the Lease does not obligate Crown to retain a maintenance facility at the airport or to retain any particular number of maintenance employees in connection with Hangar 6. The Airport Authority also admitted "[t]here is no written contract between [the Airport Authority] and either of the defendants relative to a maintenance facility." (Pl.'s Ans. to Defs. First Set of Requests for Admissions ("Pl.'s Admissions"), No. 1). Mr. Tebay testified "in hindsight" he should have included a provision in the Lease obligating Crown to retain the maintenance facility.

---

1. In opposing summary judgment, Plaintiff makes several unsupported assertions that would be inadmissible at trial. These statements have not been considered by the Court in ruling upon Defendants' motion.

2. The Airport Authority submitted grant applications to the Appalachian Regional Commission (ARC) and the Farmers Home Administration (FmHA). The Airport Authority also committed itself to invest up to one hundred twenty-five thousand dollars ($125,000.00) in the project. In addition, the Airport Authority obtained a loan from United National Bank to finance the remainder of the project. The loan closed in February 1993.

The following spring, the Airport Authority retained local engineering firms to design Hangar 6. In July 1993, difficulties were encountered when the West Virginia Fire Marshal would not approve a proposed fire suppression system for the hangar. The increased cost of a more elaborate fire suppression system prompted the Airport Authority to request the Economic Development Administration ("EDA") to allocate funds to assist in the construction.[3]

On December 15, 1993, Crown and Mesa Airlines, Incorporated ("Mesa") executed an Agreement of Purchase and Sale of Assets wherein Mesa agreed to purchase certain assets and to assume certain liabilities of Crown. Prior to this agreement, but subsequent to the execution of the Lease, Mesa conducted a due diligence investigation of the assets and liabilities of Crown in conjunction with its possible purchase of Crown. During that time, Mesa also examined the Lease.

At least as early as January 11, 1994,[4] the Airport Authority was aware Mesa soon might be acquiring certain assets of Crown. By letter dated February 2, 1994, Mesa informed the Airport Authority that Mesa did "not wish [the Airport Authority] to proceed with the construction of a hangar facility for maintenance purposes."[5] After receiving this letter, the Airport Authority continued to seek Mesa's performance.

On February 11, 1994, Crown assigned the Lease to Mesa.[6]

Over one year later, on June 14, 1995, the Airport Authority cancelled the Hangar 6 project[7] and initiated this action in the Circuit Court of Wood County. Defendants timely removed the action to this Court. Plaintiff amended its Complaint on August 28, 1995.

■ The Amended Complaint asserts claims of intentional interference with contractual relations by Mesa, breach of contract by Crown and Mesa[8], breach of the duty of good faith and fair dealing by Crown and Mesa[9], and promissory estoppel.

---

3. The Airport Authority never received final approval from the EDA for the requested funding.

4. The Minutes of the January 11, 1994 Special Meeting of the Airport Authority state, "Mr. Shaver [Vice President of the Airport Authority] asked about Mesa Airlines. Mesa Airlines is buying Crown Airways." The Airport Authority then had internal discussions regarding the possible effect an assignment would have on the parties' respective obligations under the Lease.

5. The Airport Authority relies on this letter as the sole basis for its breach of contract claim. (Pl.'s Admissions, No. 6).

6. The Airport Authority does not dispute Crown's right to assign the Lease to Mesa under the terms of the Lease. Further, at no time did the Airport Authority communicate to either Defendant an objection to the assignment of the Lease.

7. At the time of cancellation, the Airport Authority had not received the Fire Marshal's approval of the fire suppression system nor the funding necessary to complete the project. Consequently, actual construction had not begun.

8. Plaintiff argues it "is not claiming that Crown promised to retain a maintenance facility for fifteen years ... or that Crown promised to employ a certain number of employees at Wood County.... Crown needed to only commit itself to the retention and operation of a maintenance facility—nothing more." (Pl.'s Response to Mot. for S.J. at 7–8).

9. Plaintiff did not respond to Defendants' argument for summary judgment regarding this issue. Most importantly, Plaintiff did not reference this claim in its portion of the Pretrial Order. Accordingly, Plaintiff has abandoned this claim. *Turley v. Union Carbide Corp.*, 618 F.Supp. 1438, 1441 (S.D.W.Va.1985) (Haden, C.J.) (employee's handicap discrimination claim was abandoned where it was not mentioned in employee's suggested conclusions of law and proposed pretrial order as directed by the Court); *see* Fed.R.Civ.P. 16(e); *see also Resolution Trust Corp. v. Davies*, 824 F.Supp. 1002, 1005 (D.Kan.1993) (pretrial order supersedes prior pleadings and controls the course of the action); *Hall Dadeland Towers Assoc. v. Hardeman*, 736 F.Supp. 1422, 1433 n. 10 (N.D.Tex.1990) (" 'The pretrial order supersedes all prior pleadings, serving, in effect, as the operative answer and complaint in the case' ... The pretrial order therefore becomes 'the governing pattern of the lawsuit.' ") (quoting *United States v. Texas*, 523 F.Supp. 703, 720 (E.D.Tex. 1981) and *Morales v. Turman*, 535 F.2d 864, 867 n. 7 (5th Cir.1976), *rev'd on other grounds*, 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977)).

## III.

## THE LAW

### A. PAROL EVIDENCE [10]

■ It is well-settled parol evidence of prior or contemporaneous oral negotiations or stipulations is inadmissible to vary, contradict, add to, or explain the terms of a complete, unambiguous, written instrument in the absence of fraud, accident or mistake [11] in its procurement. *Haymaker v. General Tire, Inc.*, 187 W.Va. 532, 420 S.E.2d 292 (1992) (citing *Yoho v. Borg–Warner Chem.*, 185 W.Va. 265, 406 S.E.2d 696, 697 (1991) (per curiam)); *Collia v. McJunkin*, 178 W.Va. 158, 358 S.E.2d 242, 244, *cert. denied*, 484 U.S. 944, 108 S.Ct. 330, 98 L.Ed.2d 357 (1987).

> "The parol evidence rule, designed to promote the certainty and stability of contractual obligations, 'is founded upon the principle that when parties have discussed and agreed upon their obligations to each other and reduced those terms to writing, the writing, if clear and unambiguous, furnishes better and more definite evidence of what was undertaken by each party than the memory of man.' "

*Doganieri v. United States*, 520 F.Supp. 1093, 1097 (N.D.W.Va.1981) (quoting 30 Am. Jur. *Evidence* § 1016 (1967)).

■ "Contract language usually is considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of words employed and obligations undertaken." *Fraternal Order of Police Lodge Number 69 v. City of Fairmont*, —— W.Va. ——, —— ——, 468 S.E.2d 712 (W.Va.1996). "A contract is ambiguous when it is *reasonably* susceptible to more than one meaning in light of the surrounding circumstances and after applying the established rules of construction." *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329, 342 n. 23 (1995) (emphasis added). Where a provision of a contract is ambiguous, it is construed against the drafter. *Payne v. Weston*, —— W.Va. ——, ——, 466 S.E.2d 161, 166 (1995)

(citing *West Virginia Ins. Co. v. Lambert*, 193 W.Va. 681, 458 S.E.2d 774, Syl. Pt. 1 (1995)). A contract containing unambiguous language must be construed according to its plain and natural meaning. *Payne v. Weston*, —— W.Va. ——, ——, 466 S.E.2d 161, 166 (W.Va.1995). The Lease in issue is unambiguous.

■ Where a writing appears to be a complete contract, embracing all the particulars necessary to make a perfect agreement and designed to express the whole arrangement between the parties, it is conclusively presumed to embrace the entire contract and all the terms and provisions of the agreement. *Kelley, Gidley, Blair & Wolfe, Inc. v. City of Parkersburg*, 190 W.Va. 406, 438 S.E.2d 586, 589 (1993) (citing *Jones v. Kessler*, 98 W.Va. 1, 126 S.E. 344, Syl. Pt. 1 (1925)). Parol evidence that would vary or supplement the terms of an unambiguous contract is excluded.

■ "A written contract merges all negotiations and representations which occurred before its execution, and in the absence of fraud, mistake, or material misrepresentations extrinsic evidence cannot be used to alter or interpret language in a written contract which is otherwise plain and unambiguous on its face." *Iafolla v. Douglas Pocahontas Coal Corp.*, 162 W.Va. 489, 250 S.E.2d 128, Syl. Pt. 3 (1978); *see also Providence Washington Ins. Co. v. Board of Educ.*, 49 W.Va. 360, 38 S.E. 679, Syl. Pt. 1 (1901) ("Where the parties have made a written agreement, the writing is regarded as the exclusive evidence of the contract, and all oral negotiations and stipulations preceding or accompanying the execution of the written agreement are merged in it and are inadmissible in evidence."); *accord Kanawha Banking & Trust Co. v. Gilbert*, 131 W.Va. 88, 46

---

**10.** Defendants argue any claims of alleged oral agreements are barred by the parol evidence rule and by the Statute of Frauds, West Virginia Code § 55–1–1 (1990). Because the Court concludes the alleged prior oral negotiations or statements effectively merge into the final contract and because Plaintiff is precluded from relying upon

alleged prior or contemporaneous oral negotiations or statements to alter, contradict, or add to the Lease, it is unnecessary to address the applicability of the Statute of Frauds.

**11.** Plaintiff makes no allegation of fraud, mistake, or accident.

S.E.2d 225 (1947); *Hartmann v. Windsor Hotel Co.*, 136 W.Va. 681, 68 S.E.2d 34 (1951); *Wyckoff v. Painter*, 145 W.Va. 310, 115 S.E.2d 80 (1960). Moreover, parol evidence cannot be used to supply any gap or omission in the terms of a written contract. *Crawford v. Workman*, 64 W.Va. 10, 61 S.E. 319, Syl. Pt. 2 (1908).

■ "In order to exclude evidence of oral agreement on the ground the parties later entered into a written contract, the oral agreement must relate to the same agreement embodied in the written contract." *Clator v. Otto*, 38 W.Va. 89, 18 S.E. 378, Syl. Pt. 1 (1893).

■ Furthermore, application of the parol evidence rule may not be circumvented by asserting promissory estoppel. *See Wojciechowski v. Amoco Oil Co.*, 483 F.Supp. 109, 115 (E.D.Wis.1980) ("[T]he parol evidence rule nullifies the salutary effects of the doctrine of promissory estoppel."); *accord George Hammersmith, Inc. v. Taco Bell Corp.*, No. 90–35460, 1991 WL 159466, at *6 (9th Cir. Aug. 15, 1991) (unpublished) ("On the promissory estoppel claim, we adopt the reasoning of *Kinn v. Coast Catamaran Corp.*, 582 F.Supp. 682, 687 ( [E.]D.Wis.1984), which held that the parol evidence rule precludes reliance on oral representations which contradict a subsequent written contract."); *Hermsen v. Tarrell*, 85 S.D. 541, 188 N.W.2d 837, 839 (1971) (claim of estoppel does not overcome parol evidence rule); 28 Am.Jur.2d *Estoppel & Waiver* § 49; 32A C.J.S. *Evidence* § 966 (1964).

■ Here, the Airport Authority admitted the alleged "oral maintenance retention agreement ... invariably led to the execution of the lease." (Pl.'s Supp. Opp. to Mot. to Dis. at 8). The Airport Authority also admitted "[t]hese [oral] representations merely reinforce the purpose of entering into the lease agreement in the first place." (Pl.'s Response to Mot. for S.J. at 17). In addition, Ms. Strock and Mr. Tebay testified the alleged oral promises regarding a maintenance facility were made in conjunction with the written Lease. *See* Strock Dep. at 49; Tebay Dep. at 52. Thus, the alleged oral promises relate to the same agreement embodied in the Lease and were made contemporaneously with or prior to the execution of the Lease.

The Lease explicitly and unambiguously sets forth the obligations of the parties with respect to Hangar 6. The Lease's terms are consistent on their face and support only one meaning of the words and obligations undertaken therein. No mention is made in the Lease of any obligation on the part of Crown or its assignee to retain a maintenance facility at Hangar 6. In fact, Ms. Strock and Mr. Tebay admitted the Lease does not obligate Crown or Mesa either to retain a maintenance facility at the airport or to retain a certain number of maintenance employees. *See* Strock Dep. at 46–47; Tebay Dep. at 25–26. Ms. Strock and Mr. Tebay further testified Crown's obligations under the Lease were limited to the payment of rent, utilities, and incidental obligations.

The testimony of Ms. Strock and Mr. Tebay similarly bolsters the conclusion the Lease is a fully integrated declaration of the agreement between the parties. Ms. Strock[12] and Mr. Tebay[13] testified the Lease

---

**12.** Ms. Strock testified a new contract between Crown and the Airport Authority was needed before proceeding with the construction of the new hangar. In response to the questions, Ms. Strock further admitted the following:

"Q: Were there any other contracts that you [the Airport Authority] had to get?
A: No.
Q: So the Lease agreement is the one that contains all the terms?
A: Contains all the terms?
Q: The Lease agreement is the only contract you had to obtain?
A: The Lease agreement for the use of Hangar 6, right."
Strock Dep. at 42.

**13.** Likewise, Mr. Tebay testified:

"Q: Did you intend for the lease to set forth all the parties' obligations?
A: In hindsight? I intended the lease to reflect a fair rental agreement for hangar six once it was built and completed.
        *     *     *     *     *     *
Q: But is that intended to include all of the parties' obligations.
A: Once the hangar was completed, yes.
Q: Does it include all the parties' obligations?
A: In retrospect, no. There should have been a statement that it was for a maintenance facility.
Q: So you think you left something out?

was intended to set forth all of the parties' respective contractual obligations in connection with Hangar 6. The Airport Authority also admitted "there is no written contract between [the Airport Authority] and either of the Defendants relative to a maintenance facility." (Pl.'s Admissions, No. 1).

In opposing Defendants' motion, Plaintiff contends the alleged oral representations "do not vary or contradict the terms of the lease; therefore, the parol evidence rule is not at issue." (Pl.'s Response to Mot. for S.J. at 17–18). Plaintiff's argument is without merit. Plaintiff's assertion that Crown committed itself to retain Hangar 6 as a maintenance facility clearly varies, contradicts, and adds significant and substantial obligation to the Lease agreement. As noted, Mr. Tebay conceded "in hindsight" the Lease should have included this obligation.

The Court concludes the Lease is a fully integrated document that unambiguously and explicitly sets forth all of the parties' respective obligations regarding Hangar 6. As a matter of law, the Airport Authority is precluded from relying upon alleged prior or contemporaneous oral negotiations or statements to alter or add to the terms of the Lease. Construing the unambiguous language of the Lease according to its plain and natural meaning, the Court finds and concludes neither Crown nor Mesa had any obligation under the Lease to retain a maintenance facility at Hangar 6.

### B. CONTRACT MODIFICATION

■ The Airport Authority further alleges Crown made representations regarding a maintenance facility *after* the Lease was executed. To demonstrate the parties committed themselves to a separate oral agreement, entered subsequent to the Lease, which would modify the terms of the Lease, Plaintiff must show the parties expressly agreed to any such modification, and any such modification had all of the requisites of a valid and enforceable contract, including mutual assent and separate identifiable consideration. *See*

A: In hindsight. But once again that lease was intended to reflect the rental of that building once the building was constructed and occupied."

*Wheeling Downs Racing Ass'n v. West Virginia Sportservice, Inc.,* 157 W.Va. 93, 199 S.E.2d 308, 311 (1973) ("A modification of a contract requires the assent of both parties to the contract and mutual assent is as much a requisite element in effecting a contractual modification as it is in the initial creation of a contract."); *Wilkinson v. Searls,* 155 W.Va. 475, 184 S.E.2d 735, 741 (1971) ("If such an oral agreement was made after the written lease was executed, the oral agreement was unenforceable and void for the reason it was not based on a valuable consideration."); *Steinbrecher v. Jones,* 151 W.Va. 462, 153 S.E.2d 295, 301 (1967) (modification "must be based upon a valid consideration, and the original consideration [for the contract] can not be used as consideration for any agreement of modification or alteration in connection therewith."). The Airport Authority has failed to allege the existence of these prerequisites. The Court concludes the Lease was not modified subsequent to its execution.

### C. BREACH OF CONTRACT

■ Fundamentally, for an action on the contract to succeed, the party accused of repudiation must have been a party to the contract at the time of the alleged breach. *See Microsoft Corp. v. BEC Computer Co.,* 818 F.Supp. 1313, 1316 (C.D.Cal.1992); *Professional Serv. Indus. v. Kimbrell,* 834 F.Supp. 1305, 1310 (D.Kan.1993).

■ An anticipatory breach occurs when a party to a contract asserts he will not perform a future obligation required by the contract. Anticipatory breach requires an unequivocal renunciation of the contract by an obligee. *Mollohan v. Black Rock Contracting, Inc.,* 160 W.Va. 446, 235 S.E.2d 813, 816 (1977) ("we find it well established that when an obligee sues for contract damages because of breach of contract before the time for performance is due, the anticipatory breach must be positive, absolute and unequivocal."); *see also* 4 *Corbin on Contracts* § 973 at 905 (1951) ("In order to constitute an anticipatory breach of contract, there

Tebay Dep. at 22–23.

must be a definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives.").

■ A party's failure to perform its own obligations precludes recovery against another party for breach of contract. Where one has "failed to perform an act which is a condition precedent to the assertion of a right to which he may have been entitled had he performed such act, he is not entitled to the benefit of the promise for which the omitted act was of the essence of the consideration for such promise." *Shank v. Jefferson Standard Life Ins. Co.*, 128 W.Va. 435, 36 S.E.2d 897, 903 (1946); *accord Hubler Rentals, Inc. v. Roadway Express, Inc.*, 637 F.2d 257, 260–61 (4th Cir.1981) (applying Md. law).

■ Plaintiff admitted it is relying solely upon the February 2, 1994 letter as the basis for its breach of contract claim. Mesa was not a party to the contract until February 11, 1994 when it accepted assignment of the Lease. Mesa did not breach the contract as a matter of fact and law.

■ Furthermore, the February 2, 1994 letter does not constitute an anticipatory breach. The statements in the letter do not conflict with any obligation set forth in the Lease.[14] Nor can the language in the letter be construed as "definite and unequivocal." Mesa never stated it would not perform under the Lease. In fact, nine days after sending the February 2, 1994 letter, Mesa accepted assignment of the Lease, and to date, stands ready and willing to perform its obligations under the Lease once Hangar 6 is constructed. *See* Defs. Mem. S.J. at 17 & 19; Pretrial Order at 8–9.

Construction of Hangar 6, however, has not commenced. When the Airport Authority cancelled the Hangar 6 project, it was not in a position to complete the project because it had not received the necessary funding nor the Fire Marshal's approval of the hangar's fire suppression system. The Airport Authority thus has not performed its own contractual obligations to lease a completed Hangar 6 to Mesa. The Court finds and concludes neither Crown nor Mesa breached the Lease.

## D. INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

■ West Virginia recognizes a cause of action based on tortious interference with contractual relations. *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 173 W.Va. 210, 314 S.E.2d 166, 171 (1983) (citing *Consolidation Coal Co. v. Disabled Miners of Southern West Virginia*, 328 F.Supp. 1248, *modified*, 442 F.2d 1261, *cert. denied*, 404 U.S. 911, 92 S.Ct. 228, 30 L.Ed.2d 184 (1971)). The interference may be with existing or prospective contractual, business or employment relationships. *Id.* This tort consists of "inducing or otherwise causing a third person not to enter into or continue the prospective relation" or "preventing the other from acquiring or continuing the prospective relation." *Id.* (quoting Restatement (Second) of Torts § 766B (1979).

■ In order to succeed with this claim, Plaintiff must prove:

> "(1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages."

*Id.* at 167, Syl. Pt. 2; *accord C.W. Development, Inc. v. Structures, Inc. of West Virginia*, 185 W.Va. 462, 408 S.E.2d 41, Syl. Pt. 1 (1991).

■ A party cannot be liable for interference with a contract if that party has a financial interest in the contract. *Torbett*, 314 S.E.2d at 167, Syl. Pt. 2; *accord C.W. Development*, 408 S.E.2d at 42, Syl. Pt. 1; *Shrewsbery v. National Grange Mut. Ins. Co.*, 183 W.Va. 322, 395 S.E.2d 745, 748 (1990); *Bryan v. Massachusetts Mut. Life Ins. Co.*, 178 W.Va. 773, 364 S.E.2d 786, 792 (1987).

---

**14.** The February 2, 1994 letter states Mesa "does not wish [the Airport Authority] to proceed with the construction of a hangar facility for maintenance purposes of [Mesa's] aircraft."

■ Here, a contract existed between the Airport Authority and Crown in the form of the Lease. Contrary to Plaintiff's assertions,[15] however, the Lease does not obligate Crown to retain its maintenance operations at the airport in exchange for the Airport Authority constructing a maintenance hangar. Plaintiff does not dispute Crown had a contractual right to assign the Lease to Mesa. At the time Plaintiff alleges the tortious interference occurred, Mesa, as the assignee of Crown's interests under the Lease, had a financial interest in the business of Crown. Indeed, nine days after sending the February 2, 1994 letter, Mesa assumed the same contract with which it was alleged to have interfered. Under these circumstances, Mesa cannot be said to have interfered with Plaintiff's contractual relations with Crown.

Accordingly, the Court **GRANTS** summary judgment in favor of the Defendants. The Court **ORDERS** this case dismissed and stricken from the docket of the Court.

**15.** Plaintiff asserts "a contract existed between Wood Co. and Crown, in which Wood Co. agreed to build a maintenance hangar if Crown would retain its maintenance operations at the Wood Co. Airport." (Pl.'s Response to Mot. for S.J. at 19).